333 F.3d 1092
 AMERICAN CIVIL LIBERTIES UNION OF NEVADA; Paul R. Brown; Greg Gable; Gary Peck; Shundahai Network; Unitarian Universalist Social Justice Committee, Plaintiffs-Appellants,
v.
CITY OF LAS VEGAS; Jan Laverty Jones; Fremont Street Limited Liability Corp.; Mark Paris, Defendants-Appellees.
American Civil Liberties Union of Nevada; Paul R. Brown; Greg Gable; Gary Peck; Shundahai Network; Unitarian Universalist Social Justice Committee, Plaintiffs Appellees,
v.
City of Las Vegas; Jan Laverty Jones; Fremont Street Limited Liability Corp.; Mark Paris, Defendants Appellants.
 No. 01-15958.
 No. 01-15966.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 9, 2002.
 Filed July 2, 2003.
 
 COPYRIGHT MATERIAL OMITTED Allen Lichtenstein, Las Vegas, NV; Mark Lopez, American Civil Liberties Union Foundation, New York City, NY, for the plaintiffs-appellants-cross-appellees.
 Todd L. Bice, Schreck Brignone Godfrey, Las Vegas, NV; Patrick J. Reilly, Hale Lane Peck Dennison Howard and Anderson, Las Vegas, NV; William P. Henry, Office of the City Attorney, Las Vegas, NV, for the defendants-appellees-cross-appellants.
 Appeal from the United States District Court for the District of Nevada; David Warner Hagen, District Judge, Presiding. D.C. No. CV-97-01419-DWH.
 Before: TASHIMA, THOMAS, and PAEZ, Circuit Judges.
 OPINION
 PAEZ, Circuit Judge.
 
 
 1
 In a successful bid to revive its decaying downtown, the City of Las Vegas followed the lead of towns across the United States and turned several blocks of its main downtown street into a publicly-owned pedestrian mall, the Fremont Street Experience. Fearful of the potential for disruption of merchants and customers, the City placed significant restrictions upon First Amendment activities in the Fremont Street Experience. After running afoul of these restrictions, the American Civil Liberties Union of Nevada ("ACLU") and others (jointly "the Plaintiffs") brought this 42 U.S.C. § 1983 civil rights suit. The Plaintiffs appeal the district court's determination that the mall is a nonpublic forum, and its ruling that City ordinances restricting soliciting and tabling were constitutional. The City of Las Vegas cross-appeals the district court's determination that City ordinances limiting leafleting and vending were unconstitutional.
 
 
 2
 We affirm in part, reverse in part, and remand. Because the Fremont Street Experience unmistakably possesses the characteristics of a traditional public forum, we reverse the district court's conclusion that it is a nonpublic forum. Recognizing that "[t]he First Amendment ... must deal with new problems in a changing world," Cinevision Corp. v. City of Burbank, 745 F.2d 560, 566 (9th Cir.1984) (quoting Bd. of Educ. v. Pico, 457 U.S. 853, 885, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982)), we hold that the Fremont Street Experience is a public forum. As a consequence, the restrictions on First Amendment activities must be scrutinized under a strict standard of review in order to protect adequately the right to expression. Because the City ordinances restricting leafleting and vending message-bearing materials fail even under the lesser standard applied by the district court, we affirm the district court's conclusion that they are unconstitutional. We remand to allow the district court to examine the other ordinances in question under the proper standard of review.
 
 I.
 
 3
 In the early 1990s, downtown Las Vegas was suffering from an economic downturn. The area was seen as sleazy and unsafe, and downtown casinos were unable to compete with the glitzy Las Vegas Strip. Moreover, key economic factors showed that the area was in decline. In an effort to halt the slump and return downtown to its former luster, city officials decided to emulate economic revival measures taken in towns throughout the United States by creating a pedestrian-friendly zone. Five blocks of Fremont Street, the center of the downtown area, were closed off to automotive traffic. The City of Las Vegas contracted with a private entity, the Fremont Street Experience Limited Liability Corporation ("FSELLC"), to transform frumpy Fremont Street into the glamorous Fremont Street Experience. At a cost to the public and contributing Fremont Street businesses of $70 million, the street and sidewalk were torn up, various underground infrastructure elements were installed, the street was decoratively repaved as one large promenade, and a canopy capable of generating a lightshow (known, with a dash of hyperbole, as the "celestial superstructure") was placed high overhead certain parts of the street.
 
 
 4
 The street continues to play its old role as a pedestrian thoroughfare, and at two points it is crossed by streets bearing car traffic. It also functions as a "commercial and entertainment complex," intended to be an "attraction to compete with numerous other entertainment venues in Las Vegas." In addition to the many casinos and stores that line the street, the Fremont Street Experience hosts daily performing acts and bands, and frequently holds large special events, most of which are free and open to the public. In the evening, the lightshow plays overhead for a few minutes each hour.
 
 
 5
 Concerned with providing an environment in which shoppers could sample the delights of the Fremont Street Experience without interruption or molestation, one which could compete with private malls and entertainment centers, the City prohibited various types of activity in the Fremont Street Experience. Section 10.44 of the Las Vegas Municipal Code (LVMC) prohibits any form of solicitation in the Fremont Street Experience,[1] and sections 11.68.100(I), (B), and (H) respectively prohibit leafleting, unauthorized vending, and the unauthorized erection of structures.[2] There are no specific prohibitions against picketing and demonstrations, although these may be restricted by general prohibitions against obstructive conduct. LVMC § 10.47.010.
 
 
 6
 The Fremont Street Experience was completed in 1995. In August 1997, during a small rally held by the ACLU of Nevada on the Fremont Street Experience to protest restrictions on free speech activities, local police ordered the assembled individuals to disperse. Some time later, the ACLU of Nevada, the Shundahai Network, the Unitarian Universalist Social Justice Committee, and Paul R. Brown, Greg Gable, and Gary Peck, individual members of these groups, filed this lawsuit against the City and FSELLC, as well as against Jan Laverty Jones, former mayor of Las Vegas, and Mark Paris, Executive Director of FSELLC, in their official capacities (collectively "the City" or "Defendants"). The complaint alleged that FSELLC had "adopted policies prohibiting traditional First Amendment activity on the Fremont Street Experience, such as proselytizing, charitable soliciting, distributing literature, circulating petitions and collecting signatures, picketing, and giving away or selling message-bearing merchandise," and sought an injunction and a declaration that the restrictions were unconstitutional both facially and as applied.
 
 
 7
 The City responded with a motion to dismiss the complaint or, alternatively, for summary judgment. The Plaintiffs sought a preliminary injunction enjoining enforcement of the challenged ordinances. On April 24, 1998, the district court issued a memorandum order declaring that the Fremont Street Experience was a nonpublic forum. American Civil Liberties Union v. City of Las Vegas (ACLU v. City of Las Vegas), 13 F.Supp.2d 1064, 1068 (D.Nev.1998). The basis for this determination was the fact that the City had created the Fremont Street Experience for the principal purpose of stimulating economic growth, not for the purpose of promoting expression; that great expense had been incurred in the transformation; and that the textured pavement and canopy distinguished the Fremont Street Experience from surrounding streets and sidewalks. Id. at 1076-1077.
 
 
 8
 As part of the same order, the district court granted summary judgment for Defendants on the solicitation and tabling ordinances, but concluded that even under the less rigorous standard of scrutiny applied to nonpublic forums, the leafleting and vending ordinances were likely unconstitutional. Thus, the court granted the Plaintiffs a preliminary injunction against these provisions. Each side appealed, and a panel of the Ninth Circuit dismissed the appeals in an unpublished disposition, holding that the district court did not abuse its discretion in granting the preliminary injunction. ACLU v. City of Las Vegas, 1999 WL 65130 (9th Cir.1999). The district court issued its final order on April 4, 2001, reaffirming its determination that the Fremont Street Experience was a nonpublic forum, and granting summary judgment for the City with regard to the Plaintiffs's challenge to the solicitation and tabling ordinances and their request for an injunction against interference with protected activities. However, the district court granted summary judgment for the Plaintiffs regarding the challenge to the leafleting and vending ordinances, and made the preliminary injunction permanent. Each side timely appealed.
 
 
 9
 According to the Plaintiffs, on a number of occasions after the district court issued its preliminary injunction, various individuals and groups affiliated with the Plaintiffs were ordered not to leaflet on the Fremont Street Experience and were able to continue only after vigorous protest. Additionally, on October 24, 2000, three members of the ACLU of Nevada attempted to set up a table on the Fremont Street Experience in order to pass out literature and collect signatures. FSELLC security guards initially ordered the ACLU to leave, but ultimately permitted the distribution of literature on the condition that the table be removed.
 
 II.
 
 10
 We have jurisdiction pursuant to 28 U.S.C. § 1291. A grant of summary judgment is reviewed de novo, Balint v. Carson City, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc), and may be affirmed on any ground supported by the record, Venetian Casino Resort v. Local Joint Executive Bd. of Las Vegas, 257 F.3d 937, 941 (9th Cir.2001). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Balint, 180 F.3d at 1050. In ruling on crossmotions for summary judgment, we evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences. See Hopper v. City of Pasco, 241 F.3d 1067, 1078 (9th Cir.2001); Pirkheim v. First Unum Life Ins., 229 F.3d 1008 (10th Cir.2000). We review evidentiary rulings made in the context of summary judgment for abuse of discretion. Block v. City of Los Angeles, 253 F.3d 410, 416 (9th Cir.2001). Permanent injunctive relief is also reviewed for an abuse of discretion. Robi v. Reed, 173 F.3d 736, 739 (9th Cir.1999).
 
 III.
 
 11
 We begin by noting that "the First Amendment reflects a `profound national commitment' to the principle that `debate on public issues should be uninhibited, robust, and wideopen.'" Boos v. Barry, 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Although governmental attempts to control speech are far from novel, they have new potency in light of societal changes and trends toward privatization. See Chicago Acorn v. Metropolitan Pier & Exposition Auth., 150 F.3d 695, 704 (7th Cir.1998) (expressing concern regarding "what is now a nationwide trend toward the privatization of public property"); United States Labor Party v. Knox, 430 F.Supp. 1359, 1361 (W.D.N.C.1977) (explaining that with the rise of the automobile, "downtown streets have emptied and patronage of [private] suburban shopping centers has swelled," necessitating access to other "publicly owned gathering places of the people"). "A suburbanized society whose public buildings and stores were cordoned off from free speech activities might never hear the first calls of new causes that would otherwise ignite public interest." Id. at 1362 (citing example of civil rights movement, which "developed momentum in the streets and in handbills and exhortation"). Like the Tenth Circuit, we recognize that
 
 
 12
 "[a]s society becomes more insular in character, it becomes essential to protect public places where traditional modes of speech and forms of expression can take place." United States v. Kokinda, 497 U.S. 720, 737, 110 S.Ct. 3115, 111 L.Ed.2d 571[] (1990) (Kennedy, J., concurring in the judgment). We think this is particularly true with respect to downtown public spaces conducive to expressive activities.
 
 
 13
 First Unitarian Church of Salt Lake City v. Salt Lake City Corp., 308 F.3d 1114, 1131 (10th Cir.2002) (full citation provided). Awareness of contemporary threats to speech must inform our jurisprudence regarding public forums.
 
 A.
 
 14
 The Supreme Court has constructed an analytical framework known as "forum analysis" for evaluating First Amendment claims relating to speech on government property. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); see also Cornelius v. NAACP, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Under this approach, we first determine whether the property is a traditional public forum, a designated public forum, or a nonpublic forum in order to ascertain what level of scrutiny to apply to restrictions on speech.[3] Perry, 460 U.S. at 45-46, 103 S.Ct. 948. Following this determination, we apply the indicated standard of scrutiny to decide whether the restrictions in question pass constitutional muster. Id. Thus, the scope of permissible governmental interference with expressive activity varies depending upon the nature of the location in which speech is to take place. Id. at 44, 103 S.Ct. 948. Despite considerable criticism,[4] the Supreme Court has not retreated from its embrace of the forum method of analyzing restrictions on speech. See Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation (H.E.R.E. v. City of New York), 311 F.3d 534, 546 n. 8 (2d Cir.2002).
 
 
 15
 The ability to restrict speech in public forums, whether traditional public forums or designated public forums, is "sharply circumscribed."[5] Perry, 460 U.S. at 45, 103 S.Ct. 948; see also Grossman v. City of Portland, 33 F.3d 1200, 1204 (9th Cir. 1994) ("Public fora have achieved a special status in our law; the government must bear an extraordinarily heavy burden to regulate speech in such locales." (quoting NAACP v. City of Richmond, 743 F.2d 1346, 1355 (9th Cir.1984)) (alteration omitted)).
 
 
 16
 In [a public forum], the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.... The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.
 
 
 17
 Frisby v. Schultz, 487 U.S. 474, 481, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (quoting Perry, 460 U.S. at 45, 103 S.Ct. 948). In contrast, "[i]f the forum is nonpublic, a more lenient standard applies, and the government may restrict access `as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because the public officials oppose the speaker's view.'" Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 966 (9th Cir.2002) (quoting Cornelius, 473 U.S. at 800, 105 S.Ct. 3439) (second alteration in original); see also Hale v. Dep't of Energy, 806 F.2d 910, 915 (9th Cir.1986).
 
 
 18
 The Plaintiffs do not argue that the Fremont Street Experience fits into the category of designated public forum, which is found where the government intentionally opens up a nonpublic forum to First Amendment activity "for a limited purpose such as use by certain groups ... or for the discussion of certain subjects." Perry, 460 U.S. at 46 n. 7, 103 S.Ct. 948. Thus, the question before us is whether the Fremont Street Experience is a traditional public forum or a nonpublic forum.
 
 
 19
 The quintessential traditional public forums are sidewalks, streets, and parks. United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (holding that the sidewalks adjacent to the Supreme Court were a public forum).[6] These areas have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). As a result, sidewalks, streets, and parks generally "are considered, without more, to be `public forums.'" Grace, 461 U.S. at 177, 103 S.Ct. 1702; see also Frisby v. Schultz, 487 U.S. at 481, 108 S.Ct. 2495 ("No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora.").
 
 B.
 
 20
 No clear-cut test has emerged for determining when a traditional public forum exists. In the absence of any widespread agreement upon how to determine the nature of a forum, courts consider a jumble of overlapping factors,[7] frequently deeming a factor dispositive or ignoring it without reasoned explanation. Consequently, courts do not always agree on the goals and proper application of forum analysis. See, e.g., Suzanne Stone Montgomery, Note, When the Klan Adopts-a-Highway: The Weaknesses of the Public Forum Doctrine Exposed, 77 Wash. U. L.Q. 557, 558 (1999) ("[F]our different federal courts, confronted with three substantially similar programs, approached the public forum doctrine in five different ways ... [and] reached three different decisions regarding the type of forum at issue.").
 
 
 21
 However, the factors emphasized by the courts consistently reflect two underlying considerations. First, and most significantly, there is a common concern for the compatibility of the uses of the forum with expressive activity. As the Supreme Court has stated, "The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); see also Hale, 806 F.2d at 915-16 (holding that where land "has been withdrawn from public use for the purpose of conducting nuclear testing[, i]ts use for expressive, as well as nonexpressive, activity by the public is limited"); Warren v. Fairfax County, 196 F.3d at 192-93 (noting that "[o]ne characteristic has been assumed in all of the Supreme Court cases that address [public forums]: opening the nonpublic forum to expressive conduct will somehow interfere with the objective use and purpose to which the property has been dedicated"); H.E.R.E. v. City of New York, 311 F.3d at 552 ("Consideration of the relevant factors ... demonstrates that permitting all forms of expressive activity in the Plaza would be incompatible with its `intended purpose' ...."); Lederman v. United States, 291 F.3d 36, 41 (D.C.Cir. 2002) (stating that "courts have long recognized that [the areas in question] meet the definition of a traditional public forum: They have traditionally been open to the public, and their intended use is consistent with public expression").
 
 
 22
 Secondly, the case law demonstrates a commitment by the courts to guarding speakers' reasonable expectations that their speech will be protected. See, e.g., Grace, 461 U.S. at 180, 103 S.Ct. 1702 (expressing concern regarding allegedly nonpublic forums that provide "no separation... and no indication whatever to persons ... that they have entered some special type of enclave."); Gerritsen v. City of Los Angeles, 994 F.2d 570, 576 (9th Cir.1993) (noting that area at issue "is still part of the park and it is indistinguishable from other sections of the park in terms of visitors' expectations of its public forum status"); Freedom from Religion Foundation, Inc. v. City of Marshfield, 203 F.3d 487, 494 (7th Cir.), as amended (2000) ("[N]o visual boundaries currently exist that would inform the reasonable but unknowledgeable observer that the Fund property should be distinguished from the public park."). "The recognition that certain government-owned property is a public forum provides open notice to citizens that their freedoms may be exercised there without fear of a censorial government, adding tangible reinforcement to the idea that we are a free people." Lee, 505 U.S. at 696, 112 S.Ct. 2701 (Kennedy, J., concurring). Remaining focused upon these underlying concerns may enable us to avoid the accusation of applying forum analysis in a rigidly formulaic manner.
 
 
 23
 Our circuit has emphasized the following three factors in considering whether an area constitutes a traditional public forum: 1) the actual use and purposes of the property, particularly status as a public thoroughfare and availability of free public access to the area, see, e.g., Venetian Casino Resort, 257 F.3d at 944-45, 948; Hale, 806 F.2d at 916; 2) the area's physical characteristics, including its location and the existence of clear boundaries delimiting the area, see, e.g., Gerritsen, 994 F.2d at 576; and 3) traditional or historic use of both the property in question and other similar properties, see, e.g., Venetian Casino Resort, 257 F.3d at 944, Jacobsen v. Bonine, 123 F.3d 1272, 1274 (9th Cir. 1997). Consideration of each of these three factors supports the conclusion that the Fremont Street Experience is a traditional public forum.
 
 
 24
 We consider the uses and purpose of a property because, by informing us of the compatibility of expressive activity with other uses of the property, they enable us to evaluate the societal costs of allowing versus restricting speech. See Hale v. Dep't of Energy, 806 F.2d at 915-16. Thus, when a property is used for open public access or as a public thoroughfare, we need not expressly consider the compatibility of expressive activity because these uses are inherently compatible with such activity. See, e.g., Venetian Casino Resort, 257 F.3d at 943. Use of a forum as a public thoroughfare is often regarded as a key factor in determining public forum status. See, e.g., Jacobsen v. Bonine, 123 F.3d at 1274; Kokinda, 497 U.S. at 727-28, 110 S.Ct. 3115 (plurality). Our sister circuits agree that "[e]xpressive activities have historically been compatible with, if not virtually inherent in, spaces dedicated to general pedestrian passage." First Unitarian Church, 308 F.3d at 1128 (10th Cir.2002); see also Lederman, 291 F.3d at 43 (D.C.Cir.2002) ("If people entering and leaving the Capitol can avoid running headlong into tourists, joggers, dogs, and strollers ... then we assume they are also capable of circumnavigating the occasional protester."); Warren, 196 F.3d at 189-90 (4th Cir.1999) (en banc); cf. ACORN, 150 F.3d at 702 (7th Cir.1998) (concluding that sidewalks at Navy Pier entertainment complex were not public forums because they were not "part of the city's automotive, pedestrian, or bicyclists' transportation grid").
 
 
 25
 Indeed, the City has conceded that the use of a property as a public thoroughfare is frequently dispositive, acknowledging in discussing First Unitarian Church that "[b]ecause the actual purpose and use of [the contested area] was as a pedestrian throughway for the general public, it met the classic definition of a public forum." The City seeks to avoid the logical consequence of this concession by urging us to adopt the Second Circuit's view that it is a forum's "primary function and purpose" that is significant in determining whether traditional public forum status applies. H.E.R.E. v. City of New York, 311 F.3d at 551 (emphasis added); see also id. at 550 ("The ability of pedestrians to cross the Plaza as a short-cut between surrounding streets is merely an incidental feature of its principal function as the entrance plaza for the Lincoln Center complex."). We decline to accept this invitation for two reasons.
 
 
 26
 First, we believe that this view elevates form over substance, engaging in precisely the type of rigid pigeonholing that is insufficiently protective both of the right to free speech and of the ability of the government to regulate property under its control. See TRIBE, supra, at 993 ("[A]n excessive focus on the public character of some forums ... can leave speech inadequately protected in some cases, while unduly hampering state and local authorities in others.") (citations omitted). The fact that the primary use of the property is not as a park or public thoroughfare is irrelevant as long as there is no concrete evidence that use for expressive activity would significantly disrupt the principal uses. See, e.g., Lederman, 291 F.3d at 42 (concluding that "the primary purpose for which the Capitol was designed — legislating — is entirely consistent with [expressive activities]" (internal quotation marks omitted)).
 
 
 27
 Strengthening our conviction is the fact that if this proposal were imposed uniformly, there would be no traditional public forums. It has frequently been observed that the "notion that traditional public forums are properties that have public discourse as their principal purpose is a most doubtful fiction." Lee, 505 U.S. at 696, 112 S.Ct. 2701 (Kennedy, J., concurring); see also Warren v. Fairfax County, 196 F.3d at 195 ("The primary purpose for which a particular piece of property was created is not dispositive. One cannot seriously argue with Justice Kennedy's observation that the traditional public fora of streets, sidewalks, and parks are not primarily designed for expressive purposes.").[8] The standard proposed by the City would have us erect a barrier to speech unsupported by the requirements of either compatibility or notice, the foundational reasons justifying forum analysis.
 
 
 28
 The use and purpose of the Fremont Street Experience support the conclusion that it is a traditional public forum. Despite its expensive make-over, the Fremont Street Experience remains a public thoroughfare. Although cars are no longer permitted to drive down the length of the Fremont Street Experience, the agreement between FSELLC and the City requires that a route for pedestrians remain open at all times, limiting FSELLC's discretion to manipulate the landscape. Additionally, automotive traffic is permitted to cross the Fremont Street Experience in two places, and pedestrians cross at each intersection. The addition of entertainment to the Fremont Street Experience's uses does not alter the fact that it remains a public thoroughfare and a shopping and gambling district.
 
 
 29
 The second factor emphasized by our cases involves the physical characteristics of a forum. Similarity to other traditional public forums not only indicates suitability for the conduct of expressive activity, but additionally, areas that are centrally located and integrated into the surrounding locale provide no alteration of expectations that would justify nonpublic forum status. See Gerritsen v. City of Los Angeles, 994 F.2d at 576 (holding that an area widely viewed as the heart of a park was a public forum); see also Jacobsen v. Bonine, 123 F.3d at 1273-74 (holding that roadside stops are not public forums, in part because they are isolated appendages to highways); Acorn, 150 F.3d at 702 (noting that the Navy Pier commercial and entertainment complex is a "discrete, outlying segment or projection of Chicago rather than a right of way" and deeming it nonpublic). We have held that cosmetic differences, such as distinctive pavement and landscaping, are insufficient to distinguish an area from surrounding public forums. Venetian Casino Resort, 257 F.3d at 945; see also Gerritsen, 994 F.2d at 576 (holding that blue lines on the pavement and a unique commercial atmosphere did not mark off Olvera Street in El Pueblo Park as a nonpublic forum).
 
 
 30
 The Fremont Street Experience is still a street: the name alone is somewhat indicative.[9] Additionally, City and State codes define pedestrian malls generally, and the Fremont Street Experience specifically, as streets.[10] Stores and businesses still line the sides of Fremont Street, and as it is located squarely in the middle of downtown, pedestrians cut across it and walk down its length. The Fremont Street Experience remains open to the elements despite the canopy and lightshow. Although there is no doubt that the decorative pavement, barriers to cars, and canopy indicate to the public that the Fremont Street Experience is not simply another street, its openness to the public and smooth integration into downtown preserve its public forum status.
 
 
 31
 The final factor that we consider in determining whether an area is a traditional public forum is its historic use as a public forum and whether it is part of the class of property which, by history and tradition, has been treated as a public forum. Venetian Casino Resort, 257 F.3d at 943-44 (considering the fact that the sidewalk that was replaced had historically been a public forum); Jacobsen v. Bonine, 123 F.3d at 1274 (noting that interstate rest stop areas, as relatively modern creations, have not traditionally been used for expressive activity). This factor is invariably mentioned. See, e.g., Lee, 505 U.S. at 680-81, 112 S.Ct. 2701; Grace, 461 U.S. at 178-79, 103 S.Ct. 1702 (holding that although traditionally property itself had not been held open for use of public, it was a public forum because it belonged to the class of property historically available for expression); First Unitarian Church, 308 F.3d at 1129; Freedom from Religion, 203 F.3d at 494; Warren, 196 F.3d at 190, 196.
 
 
 32
 The Fremont Street Experience meets the requirements of traditional use; there is no dispute that Fremont Street was historically a public forum. Moreover, our case law indicates that we regard public pedestrian malls and commercial zones as the type of property traditionally used as a public forum. Thus, in Gaudiya Vaishnava Society v. City & County of San Francisco, we held that San Francisco's commercial Fisherman's Wharf and Union Square districts were public forums. 952 F.2d 1059, 1061, 1065 (9th Cir.1990), as amended (9th Cir.1991). Despite their concentration of businesses, their distinctive character, and their role in fostering commerce, we considered them to be public streets, and hence traditional public forums. Id. Likewise, in Gerritsen v. City of Los Angeles, we acknowledged that "the Olvera Street area is a distinctive section of the park, with a unique historic and cultural atmosphere which is designed to foster commercial exchange." 994 F.2d at 576. Nonetheless, we held that Olvera Street's "special ambience" did not diminish its public forum status. Id.; see also Perry v. Los Angeles Police Dep't, 121 F.3d 1365, 1368, 1369 (9th Cir.1997) (holding that the Venice Beach Boardwalk was a traditional public forum, and its commercial nature was relevant not to public forum status, but to the outcome of the time, place, and manner test). The Fremont Street Experience was not only historically a public forum, but also falls into the type of property that is traditionally regarded as a public forum.
 
 
 33
 In concluding that the Fremont Street Experience was a nonpublic forum, the district court relied upon the fact that it was created for the purpose of stimulating commercial activity, not promoting expression. However, the intent of a government to create a nonpublic forum has no direct bearing upon traditional public forum status. Arkansas Educ. Television Comm'n, 523 U.S. at 678, 118 S.Ct. 1633; First Unitarian Church, 308 F.3d at 1124 ("We first reject the contention that the City's express intention not to create a public forum controls our analysis."); Henderson v. Lujan, 964 F.2d 1179, 1182-83 (D.C.Cir.), as amended (D.C.Cir.1992) (holding that the argument that intent to forbid expressive conduct is relevant to forum analysis "misconceives the role of government intent and practice"). As the Supreme Court has made clear, "traditional public fora are open for expressive activity regardless of the government's intent." Arkansas Educ. Television Comm'n, 523 U.S. at 678, 118 S.Ct. 1633.
 
 
 34
 Thus, the City's claim that "the government's `subjective intent' is a key factor in public forum analysis" conflates the factors necessary for the creation of a designated public forum with those for a traditional public forum. See, e.g., id. at 677, 118 S.Ct. 1633 (contrasting traditional public forums, which are "defined by the objective characteristics of the property," with designated public forums, which are created "only by intentionally opening a nontraditional public forum for public discourse" (emphasis added)); First Unitarian Church, 308 F.3d at 1124 ("It is only with respect to designated fora that the Supreme Court's forum analysis has focused on whether there has been `purposeful government action' creating a forum `in a place not traditionally open to assembly and debate.'" (quoting Arkansas Educ. Television Comm'n, 523 U.S. at 677, 118 S.Ct. 1633)); cf. Kreisner v. City of San Diego, 1 F.3d at 785.[11]
 
 
 35
 If the government's intent were a factor in determining the existence of a traditional public forum, any new public area, even a new street or park, could be created as a nonpublic forum as long as the government's intent to do so were memorialized in restrictive statutes or statements of purpose.[12] This result would make a mockery of the protections of the First Amendment. Rather than permit such an outcome, we clarify that government intent is relevant only insofar as it relates to the objective use and purpose of an area.[13] Thus, the (intentional) addition of entertainment to the functions of Fremont Street may be relevant to forum analysis, but the government's intent in and of itself is not a factor.
 
 C.
 
 36
 An additional consideration also persuades us that the Fremont Street Experience is a traditional public forum. The parties agree that Fremont Street was historically a public forum. Although it is possible for a public forum to lose its status, "the destruction of public forum status ... is at least presumptively impermissible." Grace, 461 U.S. at 180, 103 S.Ct. 1702; see also Kreisner v. City of San Diego, 1 F.3d 775, 785 (9th Cir.), as amended (9th Cir.1993) (expressing "grave doubts about the City's ability, should it so choose, to withdraw the[park] from its status as a traditional public forum"). The government "may not by its own ipse dixit destroy the public forum status of streets and parks which have historically been public forums." Grace, 461 U.S. at 180, 103 S.Ct. 1702 (quoting Greenburgh Civic Ass'ns, 453 U.S. at 133, 101 S.Ct. 2676) (internal quotation marks omitted). As a result, the onus is on the Defendants to demonstrate that the area encompassed by the Fremont Street Experience is no longer a street and has lost its public forum status.
 
 
 37
 In order to change a property's public forum status, the state "must alter the objective physical character or uses of the property." Int'l Society for Krishna Consciousness v. Lee, 505 U.S. at 700, 112 S.Ct. 2701 (Kennedy, J., concurring); see also Venetian Casino Resort, 257 F.3d at 944 (rejecting the idea that relocation of a sidewalk had fundamentally altered its character or use so as to permit a change in its public forum status); Hale, 806 F.2d at 915 (holding that roadway was no longer a public forum because "[t]he land containing the roadway has been withdrawn from public use for the purpose of conducting nuclear testing"). In the case of the Fremont Street Experience, there has been no fundamental alteration of character or use. The principal uses of Fremont Street, both before and after its transformation, are as a commercial district and public thoroughfare. The grime of Fremont Street has been scrubbed away and it has been dramatically redesigned, but its character as a central commercial street remains.
 
 
 38
 The Fremont Street Experience is a traditional public forum: its public forum status was not destroyed by its transformation, and its current characteristics are those of a public forum.[14]
 
 IV.
 
 39
 Because the district court erroneously found that the Fremont Street Experience was a nonpublic forum, it applied an improper standard to measure the appropriate balance between government regulation and free expression. Instead, the challenged restrictions must be evaluated under the more demanding standard applicable in a traditional public forum. We proceed to address the district court's determinations as to the Plaintiffs' challenges to the restrictions on leafletting, vending, solicitation, and the use of tables.
 
 A. Leafleting
 
 40
 The district court struck down LVMC section 11.68.100(I)'s outright ban on "[i]n-person distribution to passersby in a continuous or repetitive manner of any physical or tangible things and printed, written or graphic materials," finding that even under the lesser standard of reasonableness the ordinance did not survive. Clearly, the ban on leafleting cannot survive the more rigorous standard appropriate for a public forum.
 
 
 41
 In order to impose restrictions on the time, place, or manner of protected speech in a public forum, the restriction must be "justified without reference to the content of the regulated speech ... narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting Clark v. Community for Creative Non Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). Although the ban on leafleting is content-neutral, such an absolute ban is clearly not narrowly tailored, nor does it leave open ample alternative channels for communication. Schneider v. New Jersey, 308 U.S. 147, 162-63, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (holding that prevention of littering is insufficient to justify prohibition on leafleting on public street). The injunction against the leafleting ordinance was properly granted under any standard, and thus we uphold the summary judgment and permanent injunction with regard to this subsection of the ordinance.
 
 B. Vending of Materials with Messages
 
 42
 The vending ordinance prohibits vending "unless conducted or authorized by The Fremont Street Experience Limited Liability Company." LVMC § 11.68.100(B). The district court found that this restriction provided government officials with unbridled discretion to regulate speech, and therefore it was unconstitutional even under a reasonableness standard. We agree with the district court that by placing the decision whether to authorize vending wholly within the discretion of an FSELLC official, the ordinance created a situation ripe for abuse, in violation of the First Amendment.
 
 
 43
 "It is unconstitutional to grant an official unfettered discretion to deny a permit application." Gaudiya, 952 F.2d at 1066 (internal quotation marks omitted). Discretionary permits are intolerable because of "two major First Amendment risks associated with unbridled licensing schemes: selfcensorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship `as applied' without standards by which to measure the licensor's action." City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).
 
 
 44
 At issue in Lakewood was a standardless discretionary ordinance requiring newspaper publishers to obtain annual permits if they wished to place newsracks on public property. Id. The Court emphasized two factors in holding that a facial challenge to an ordinance is appropriate "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity." Id. at 755, 108 S.Ct. 2138. First, the Court saw a significant danger of selfcensorship and viewpoint discrimination in the requirement that publishers apply each year for a permit, because the licensor could "measure [the proposed expression's] probable content or viewpoint by speech already uttered." Id. at 759, 108 S.Ct. 2138. Secondly, because the Lakewood permitting system involved newspapers, it was "directed narrowly and specifically at expression or conduct commonly associated with expression." Id. at 760, 108 S.Ct. 2138. These two factors, taken together, justified allowing a facial challenge to proceed.
 
 
 45
 These same factors are present here. Our cases show that "[t]he sale of merchandise which carries or constitutes a political, religious, philosophical or ideological message falls under the protection of the First Amendment." Gaudiya Vaishnava Society, 952 F.2d at 1063; see also Perry v. Los Angeles Police Dep't, 121 F.3d at 1368; One World One Family v. City & County of Honolulu, 76 F.3d 1009 (9th Cir.1996); see also Heffron v. Int'l Society for Krishna Consciousness, 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).
 
 
 46
 Moreover, the vending ordinance raises the spectre of both censorship and self-censorship. The ordinance says nothing about how the power to regulate vending is to be wielded, and it is so lacking in standards that it provides no guidance as to the permit duration or frequency of reapplication. As a result, there is considerable danger that the content of prior speech, or simply the goals of an organization, might inform the permitting process. Although the highly exacting standards of Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), are not required for a content-neutral permit scheme like the present one, limits on the discretion of the licensor are necessary to prevent viewpoint or content discrimination. Thomas v. Chicago Park Dist., 534 U.S. 316, 322-23, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). Such limits must provide "`narrowly drawn, reasonable and definite standards'" that are "reasonably specific and objective, and do not leave the decision `to the whim of the administrator.'" Id. at 781 (quoting Forsyth County v. Nationalist Movement, 505 U.S. 123, 133, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)). The district court clearly acted correctly in granting summary judgment to Plaintiffs and issuing a permanent injunction against enforcement of this ordinance with respect to message-bearing merchandise.
 
 C. Solicitation
 
 47
 Applying the scrutiny appropriate for a nonpublic forum, the district court found that the prohibition on solicitation was reasonable in light of the City's interests in promoting the commercial purpose of the Fremont Street Experience. As we have concluded, the appropriate standard is that which pertains to a public forum. Because solicitation is an expressive activity, and hence is protected under the First Amendment, the district court will need to determine on remand whether the City is able to show that the restriction is narrowly tailored to serve a significant government interest without "burden[ing] substantially more speech than is necessary to further the government's legitimate interests." Ward, 491 U.S. at 798-99, 109 S.Ct. 2746; see also Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (holding that "charitable appeals for funds, on the street or door-to-door, involve a variety of speech interests — communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes — that are within the protection of the First Amendment"); Gaudiya, 952 F.2d at 1064 ("`Informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues' is fully protected.").
 
 D. Use of Tables
 
 48
 Section 11.68.100(H)'s ban on the unauthorized erection of structures includes "[t]he placement of any table ... within the Pedestrian Mall." Just as with the solicitation ordinance, we remand this issue to the district court to apply the heightened standard of scrutiny. Remand to the district court also will allow further exploration of the factual record, as well as clarification regarding whether the Plaintiffs intended to assert an as-applied or facial challenge to this ordinance. The Plaintiffs may wish to clarify their claim by seeking leave to amend their complaint in the district court.
 
 
 49
 We note that in order for the Plaintiffs to challenge successfully the constitutionality of the City's restrictions on the use of tables, they must show that the erection of tables falls under the protection of the First Amendment. Roulette v. City of Seattle, 97 F.3d 300 (9th Cir.1996); One World One Family Now, Inc. v. Nevada, 860 F.Supp. 1457 (D.Nev.1994). Some tension exists among the circuits on the question of whether setting up a table is conduct commonly associated with expression.[15] Compare One World One Family Now v. City of Miami Beach, 175 F.3d 1282, 1285-86 (11th Cir.1999) (finding that tables used to distribute protected literature are within the protection of the First Amendment), and One World One Family Now v. City of Key West, 852 F.Supp. 1005, 1009-10 (S.D.Fla.1994) (finding portable T-shirt tables protected because they are more analogous to newsracks than to newsstands), with Int'l Society for Krishna Consciousness v. Rochford, 585 F.2d 263, 270 (7th Cir.1978) (briefly noting that a provision, not challenged by plaintiffs, that prohibited erecting a table or other structures in an airport did not facially restrict the exercise of guaranteed rights). Thus, the issue may benefit from consideration in light of the specific factual context.
 
 E. General Injunction
 
 50
 Likewise, we reverse the district court's denial of an injunction against interference with First Amendment activities on the Fremont Street Experience. We remand this issue to the district court for consideration in light of the public forum status of the Fremont Street Experience.
 
 CONCLUSION
 
 51
 In sum, we reverse the district court's determination that the Fremont Street Experience was not a public forum. We affirm the district court's grant of summary judgment to the ACLU and issuance of a permanent injunction against enforcement of the leafleting ordinance, LVMC § 11.68.100(I), and vending ordinance with respect to the sale of message-bearing items, LVMC § 11.68.100(B). We reverse the district court's grant of summary judgment to the Defendants with regard to the general injunction and solicitation and tabling ordinances, LVMC §§ 10.44 and 11.68.100(H), and remand to allow the district court to consider the constitutionality of these restrictions in light of the Fremont Street Experience's public forum status.
 
 
 52
 The Plaintiffs shall recover their costs on appeal.
 
 
 53
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Solicitation in the Fremont Street Experience is regulated by a provision of the Las Vegas Municipal Code that reads: "Solicitation at certain locations — Misdemeanor. Any individual who personally engages in solicitation at any of the following places shall be guilty of a misdemeanor: ... (F) Within the area designated as a pedestrian mail [sic]." LVMC § 10.44.030
 
 
 [2]
 The relevant portion of the Pedestrian Mall Act reads:
 Prohibited. The following are prohibited within the Pedestrian Mall: ...
 (B) Mall vending, mall advertising, mall entertainment special events or other commercial activities unless conducted or authorized by The Fremont Street Experience Limited Liability Company; ...
 (H) The placement of any table, rack, chair, box, cloth, stand, booth, container, structure, or other object within the Pedestrian Mall except as necessary for emergency purposes, or the maintenance or repair of the Pedestrian Mall, or as authorized by The Fremont Street Experience Limited Liability Company for special events, mall advertising, mall entertainment or mall vending or other commercial and entertainment activities;
 (I) In-person distribution to passersby in a continuous or repetitive manner of any physical or tangible things and printed, written or graphic materials....
 LVMC § 11.68.100.
 
 
 [3]
 Our circuit also recognizes a fourth category, the limited public forum, which has no relevance hereSee Hopper v. City of Pasco, 241 F.3d at 1074-75; DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 965 (9th Cir.1999).
 
 
 [4]
 See, e.g., LAWRENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 986-97 (2d ed.1988); Stephen G. Gey, Reopening the Public Forum — From Sidewalks to Cyberspace, 58 OHIO STATE L.J. 1535 (1998); David A. Stoll, Public Forum Doctrine Crashes at Kennedy Airport, Injuring Nine: International Society for Krishna Consciousness, Inc. v. Lee, 59 BROOK. L. REV. 1271 (1993); Robert C. Post, Between Governance and Management: The History and Theory of the Public Forum, 34 UCLA L. REV. 1713 (1987).
 
 
 [5]
 The First Amendment applies to state and local governments through the Fourteenth AmendmentHawkins v. City & County of Denver, 170 F.3d 1281, 1286 (10th Cir.1999). Neither party contests the premise that FSELLC is a state actor, and its pervasive entanglement with the City of Las Vegas and performance of an exclusively and traditionally public function support that conclusion. See Lee v. Katz, 276 F.3d 550, 554 (9th Cir. 2002).
 
 
 [6]
 It is a matter of some debate whether the category of traditional public forum includes properties other than streets, sidewalks, and parks. The Supreme Court's willingness to explore whether mailboxes were a traditional public forum implied that this category was not strictly limitedSee United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 128-29, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). However, the Court also has stated in dicta that "[t]he Court has rejected the view that traditional public forum status extends beyond its historic confines." Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 678, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). Considering this statement, the Fourth Circuit has noted:
 The Court has never precisely stated what these confines are, however. For instance, the Court has never defined the terms "street," "sidewalk," or "park." Nor has the Court strictly limited the traditional public forum category to streets, sidewalks, and parks.
 Warren v. Fairfax County, 196 F.3d 186, 192 (4th Cir.1999) (en banc). Deeming forum analysis a useful tool rather than a "straitjacket," the Second Circuit has considered "not only whether the Plaza falls within those categories of property historically deemed to be traditional public fora, but also whether it is the type of property that should be so classified." H.E.R.E. v. City of New York, 311 F.3d at 546.
 
 
 [7]
 See, e.g., Int'l Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 679-82, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (evaluating lack of historic use, absence of free access to the public or use for the exchange of ideas, and separation from acknowledged public areas in concluding that airports are nonpublic forums); United States v. Kokinda, 497 U.S. 720, 727-28, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality) (assessing thoroughfare status and current uses); Acorn, 150 F.3d 695 (7th Cir.1998) (balancing interests and also considering public thoroughfare status, value of area as expressive locale, and government interest in commercial revenues); Hale v. Dep't of Energy, 806 F.2d at 916 (9th Cir. 1986) (considering public thoroughfare status and open access to public); Int'l Society for Krishna Consciousness v. New Jersey Sports & Exposition Auth., 691 F.2d 155 (3d Cir.1982) (considering dedication of arena to recreational use and inconsistency between free speech and governmental interests); Citizens to End Animal Suffering & Exploitation v. Faneuil Hall Marketplace, 745 F.Supp. 65, 75 76 (D.Mass.1990) (considering historic use and use as a pedestrian connection to purely public adjoining areas).
 
 
 [8]
 On this same note, Justice Brennan once stated in dissent: Public sidewalks, parks, and streets have been reserved for public
 use as forums for speech even though government has not constructed them for expressive purposes. Parks are usually constructed to beautify a city and to provide opportunities for recreation, rather than to afford a forum for soapbox orators or leafleteers; streets are built to facilitate transportation, not to enable protesters to conduct marches; and sidewalks are created with pedestrians in mind, not solicitors. Hence, why the sidewalk was built is not salient.
 Kokinda, 497 U.S. at 744, 110 S.Ct. 3115 (Brennan, J., dissenting).
 
 
 [9]
 But note that the government's public characterizations of a disputed area may be unreliable. In the Recommending Committee Meeting of August 14, 1995, in which extensive testimony was taken regarding the negative impacts of solicitation on Fremont Street, Deputy City Attorney Jerbic recommended striking all references to the word street in the Pedestrian Mall Ordinance. The Supreme Court clearly had such linguistic manipulation in mind when it stated, "Nor may the government transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property."Grace, 461 U.S. at 180, 103 S.Ct. 1702.
 
 
 [10]
 Section 268.811(3) of the Nevada Revised Statutes states: "`Pedestrian mall' means an area including portions of one or more streets or alleys that has been set aside for use primarily by pedestrians and to which access by motor vehicles is prohibited or restricted." The Las Vegas Municipal Code provides that a sidewalk is "any surface provided for the exclusive use of pedestrians." LVMC 13.24.010(E). The Fremont Street Experience itself was defined in section 11.68.040(A) of the Las Vegas Municipal Code as constituted and comprised by "[t]he following streets and rights-of-way."
 
 
 [11]
 Cases cited by the City for the proposition that "[g]overnmental intent is said to be the `touchstone' of forum analysis" relate to designated public forums, not traditional public forumsGeneral Media Communications, Inc. v. Cohen, 131 F.3d 273, 279 (2d Cir.1997) (concluding that military exchanges were nonpublic forums, rather than designated public forums, and thus Congress might ban the sale or rental of sexually explicit materials); see also id. at 279 n. 7; Jacobsen v. Bonine, 123 F.3d at 1274 (discussing "location and purpose" and "subjective intent" as factors in forum analysis in Kokinda, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571, the first relating to traditional public forums and the second to designated public forums). The only case that we have found that clearly holds that government intent is a factor in evaluating traditional public forum status, H.E.R.E. v. City of New York, attempts to distinguish the myriad cases to the contrary by stating that they stand only for the proposition that "government may not alter by fiat what is indisputably a traditional public forum." 311 F.3d at 551 n. 12. We respectfully disagree with this reading of the cases, as well as with the practical implications of this holding.
 
 
 [12]
 Such a conclusion would generate an increase in clearly questionable decisions, such as that inChad v. City of Fort Lauderdale, in which a district court determined that a newly-built sidewalk next to a beach was not a traditional public forum because "having been built two years ago, [it] has not been a traditional site for expressive conduct." 861 F.Supp. 1057, 1061 (S.D.Fla.1994).
 
 
 [13]
 We note that any confusion regarding the use of intent as a factor in a traditional public forum analysis may have been exacerbated by the fact that the word "purpose," which is properly a factor when considered in its meaning of "use," can also be defined as "intent." As we emphasize here, this second meaning of purpose is not a proper factor in analysis of traditional public forum status
 
 
 [14]
 Because we conclude that the Fremont Street Experience is a public forum, we need not consider the ACLU's alternative argument that the ordinances violate the equal protection clause by exempting certain labor-related activities from the prohibitions. Nor need we consider the ACLU's contention that the district court erred in finding that the Fremont Street Experience was a nonpublic forum without an evidentiary hearing and in excluding certain exhibits and portions of affidavits. Additionally, we deny the ACLU's motion to partially strike cross-appellants's reply brief and to supplement the record. The "new" arguments raised in the City's reply brief were a reasonable response to points made in the ACLU's answering brief. With respect to the request to supplement the record with newspaper clippings, these documents were not presented to the district court and the ACLU has not shown a compelling reason why we should consider them now. Accordingly the ACLU's motion is denied
 
 
 [15]
 Our cases indicate that tables often are used in association with core expressive activities, such as gathering signatures, distributing informational leaflets, proselytizing, or selling message-bearing merchandiseSee, e.g., Gaudiya, 952 F.2d at 1060 ("As part of its activities, Greenpeace sets up tables in the city of San Francisco to bring its[environmental] message to the general public and solicit financial contributions and membership. ... [San Francisco Nuclear Weapons Freeze Campaign] communicates its message and solicits money by setting up tables in San Francisco.... To raise funds and disseminate its message, [the Committee in Solidarity with the People of El Salvador] operates street corner tables...."). Tables facilitate these activities by enabling the display of multiple pamphlets or other items, as well as the distribution of a greater amount of material. Additionally, the use of a table may convey a message by giving an organization the appearance of greater stability and resources than that projected by a lone, roaming leafleteer.