PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 09-3573

———

UNITED STATES OF AMERICA

v.

MICHAEL ANTHONY MARCAVAGE,
Appellant

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-08-mj-00511-001)
District Judge:  Honorable Legrome D. Davis

———

Argued April 13, 2010
Before:  FISHER, HARDIMAN and
COWEN, *Circuit Judges*.

(Filed: June 16, 2010)

C. Scott Shields (Argued)
Shields & Hoppe
223 North Monroe Street, Suite 305

P.O. Box 23
Media, PA  19063
      *Counsel for Appellant*

Richard W. Goldberg (Argued)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
      *Counsel for Appellee*

Edward Diver
John J. Grogan
Langer, Grogan & Diver
1717 Arch Street
Suite 4130, The Bell Atlantic Tower
Philadelphia, PA  19103

--------

OPINION OF THE COURT

--------

FISHER, *Circuit Judge*.

Michael Anthony Marcavage led an anti-abortion demonstration on a sidewalk in front of the Liberty Bell Center in Independence National Historical Park in Philadelphia. When park rangers ordered him to move to a nearby location away from the sidewalk and granted him a verbal permit to demonstrate there, Marcavage refused until he was forcibly

2

removed. He was cited for violating the terms of a permit and interfering with agency function. A Magistrate Judge convicted him of both offenses and rejected his First Amendment defense, a ruling upheld by the District Court. We conclude that Marcavage's permit violation must be vacated because the verbal permit he was issued was invalid and that his interference conviction must be vacated because it was obtained in violation of his First Amendment right to free speech.

## I.

Independence National Historical Park ("Park"), located in downtown Philadelphia, Pennsylvania, is a national park administered by the National Park Service, a division of the Department of the Interior.[1] It is home to Independence Hall and the Liberty Bell, among other sites and objects of historical interest. The Liberty Bell is located within a block of the Park bounded by Market Street to the north, Chestnut Street to the south, 6th Street to the west, and 5th Street to the east. The building housing the Liberty Bell, the Liberty Bell Center, is located in the southwest corner of the block, abutting 6th and Chestnut Streets. The 6th Street sidewalk, like those running along 5th, Market and Chestnut Streets, is partially made of Belgian block on the portion directly adjacent to the street, while its remaining surface area is covered with slate. The area of the

---

[1]Because Marcavage appeals his conviction, we must view the facts in a light most favorable to the government. *United States v. Provenzano*, 620 F.2d 985, 989 n.4 (3d Cir. 1980).

6th Street sidewalk bordering the Liberty Bell Center is partially lined with chained metal bollards along its curb. Market and Chestnut Streets are also rimmed with bollards.

Demonstrations of varying size take place in the Park each year. In 2007, for instance, 175 permits were issued for demonstrations collectively involving more than 100,000 people. The messages of the groups leading these demonstrations run the gamut; they include immigration policy, gay rights, and Tibet's political status, to name just a few examples. The Code of Federal Regulations outlines a process for obtaining a permit to demonstrate in national parks, including Independence National Historical Park. *See* 36 C.F.R. § 2.51(a). A prospective demonstrator must submit to the Park superintendent an application containing basic information about the nature of the proposed demonstration, *id.* § 2.51(b), and the regulations require the superintendent to issue the permit while making exceptions for events that, among other things, threaten public health or safety or impair the Park's "atmosphere of peace and tranquillity," *id.* § 2.51(c).

On October 6, 2007, Marcavage headed an approximately twenty-person-strong anti-abortion demonstration along the sidewalks surrounding the Park. His group had neither applied for nor obtained a permit to demonstrate in the Park. Construction around the block of the Park in which the Liberty Bell Center is located left the entrance and exit opening onto the 6th Street sidewalk as the only means of accessing the Center on the day of Marcavage's demonstration. Marcavage and some other members of his group positioned themselves on the sidewalk's Belgian block outside the 6th Street entrance to the

4

Liberty Bell Center, while some of their co-demonstrators were stationed at different spots along that sidewalk and nearby sidewalks. Several members of the group displayed signs depicting aborted fetuses and other anti-abortion-related images. Although Marcavage was not holding a sign, he both spoke with and preached to passers-by and people waiting in line to enter the Liberty Bell Center, for a while with the aid of a bullhorn.

At approximately 11:45 a.m., Alan Saperstein, a National Park Service ranger employed at the Park, approached Marcavage, informed him that he could not demonstrate directly outside the Center's entrance and exit, and told him to move to an area near the Independence Visitor Center on Market Street and not to use his bullhorn in front of the Liberty Bell Center. Marcavage and his group stayed put. At around 12:10 p.m., Saperstein again told Marcavage to move his demonstration to Market Street and to stop using the bullhorn in front of the Liberty Bell Center. Marcavage again refused to comply. At approximately 12:40 p.m., Saperstein approached Marcavage and put him in contact by cellular telephone with Ian Crane, Saperstein's supervisor and the Park's chief ranger. Crane, who had dealt with Marcavage during past demonstrations in the Park, asked Marcavage to obey Saperstein's order and encouraged him to move to a different location. Marcavage refused and stayed on the 6th Street sidewalk. At approximately 1:10 p.m., Saperstein again approached Marcavage and explained that he needed a permit to hold his demonstration. Saperstein then granted Marcavage a verbal permit, authorizing the demonstration to take place in a grassy area on the opposite side of the Liberty Bell Center – an area the Park had apparently designated for demonstrations – and Marcavage to use his

bullhorn at that location. Marcavage did not relocate. At 1:46 p.m., Saperstein again ordered Marcavage to move to that location and Marcavage again refused. At approximately 2:05 p.m., Saperstein, by now accompanied by a few other rangers, again tried to speak with Marcavage and ordered him to move, but Marcavage again refused to comply. Saperstein and a fellow ranger then physically restrained Marcavage by holding his hands behind his back and marched him off the 6th Street sidewalk and through the gate leading to the Liberty Bell Center. There, Marcavage was cited for violating the terms of a permit under 36 C.F.R. § 1.6(g)(2). Several months later, Marcavage was mailed a second citation for interfering with agency function in violation of 36 C.F.R. § 2.32. Both citations are misdemeanors.

Following a two-day bench trial, a Magistrate Judge in the Eastern District of Pennsylvania found Marcavage guilty of both offenses, rejected his First Amendment defense, and sentenced him to twelve months' probation. The District Court affirmed. Marcavage has timely appealed his conviction, raising both sufficiency-of-the-evidence and First Amendment challenges.[2]

## II.

---

[2]The Magistrate Judge had jurisdiction under 18 U.S.C. § 3401, the District Court had jurisdiction under 18 U.S.C. § 3231 and 18 U.S.C. § 3402, and we have jurisdiction under 28 U.S.C. § 1291. *See United States v. Rosario*, 118 F.3d 160, 162 (3d Cir. 1997).

6

In determining whether a defendant is entitled to a judgment of acquittal, "[w]e must view the evidence in the light most favorable to the . . . verdict and presume that the [finder of fact] properly evaluated credibility of the witnesses, found the facts, and drew rational inferences." *United States v. Wasserson*, 418 F.3d 225, 237 (3d Cir. 2005) (quotation marks and citation omitted). "The verdict . . . must be sustained if there is substantial evidence, taking the view most favorable to the [g]overnment, to support it." *Id.* (quotation marks and citation omitted). Legal determinations are given plenary review, *United States v. Ledesma-Cuesta*, 347 F.3d 527, 530 (3d Cir. 2003), while factual findings must be upheld unless clearly erroneous, *United States v. Helbling*, 209 F.3d 226, 237 (3d Cir. 2000).

We exercise plenary review over the legal question whether a defendant's First Amendment rights have been violated. *See United States v. Kosma*, 951 F.2d 549, 553 (3d Cir. 1991). While we review a district court's factual findings "with substantial deference, reversing only for clear error," *United States v. Antar*, 38 F.3d 1348, 1357 (3d Cir. 1994) (citation omitted), in the First Amendment context we have an "obligation independently to examine the whole record to ensure that the judgment does not constitute a forbidden intrusion on the field of free expression," *United States v. Scarfo*, 263 F.3d 80, 91 (3d Cir. 2001) (internal quotation marks and citations omitted).

**III.**

**A.**     **Sufficiency of the Evidence**

7

Marcavage was convicted of two crimes. One of those crimes was violating the terms of the verbal permit Ranger Saperstein granted him. The applicable regulation, 36 C.F.R. § 1.6(g)(2), prohibits "[v]iolating a term or condition of a permit issued pursuant to this section." Throughout these proceedings, the parties have disputed the validity of the verbal permit issued to Marcavage, Marcavage urging that a permit must be in writing and the government insisting that there is no such requirement. Neither side has referenced any legal authority to support its position. Both the Magistrate Judge and the District Court agreed with the government, reasoning that nothing in the governing regulations affirmatively imposes a writing requirement.

At oral argument, we referred the government to 36 C.F.R. § 1.4(a), which neither party had cited in either the District Court or this Court. Section 1.4(a) defines a "permit," for purposes of § 1.6(g)(2) and related provisions, as "a *written* authorization to engage in uses or activities that are otherwise prohibited, restricted, or regulated." 36 C.F.R. § 1.4(a) (emphasis added). The government indicated that it was unaware of § 1.4(a) or its effect on § 1.6(g)(2) and asked for an opportunity to review it. After oral argument, the government submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j) and now "recognizes that the permit issue here does not meet the definition provided in Section 1.4." (Appellee's Rule 28(j) letter, Apr. 19, 2010.) That recognition notwithstanding, the government rather curiously does not concede that Marcavage's § 1.6(g)(2) conviction must fall, asserting instead that Marcavage was "not prejudiced by the absence of a written document[.]" (*Id.*)

8

We know of no authority that relieves the government of its burden of proving every element of a crime if the defendant cannot show post-conviction that he was "prejudiced" by the government's failure to do so. The plain language of § 1.4(a) speaks unequivocally: a permit must be in writing. *Cf. Kleissler v. United States Forest Serv.*, 183 F.3d 196, 202 (3d Cir. 1999) (applying unambiguous regulation's plain language). Because the government's apparent reading of § 1.4(a) is both plainly erroneous and inconsistent with that regulation, we give it no weight. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). If the government is looking for prejudice, it need look no further than its having sought and obtained Marcavage's conviction on a fatally flawed legal premise. Because Marcavage's permit was not in writing, it was not valid. Hence, his § 1.6(g)(2) conviction cannot stand and, as such, it will be vacated.

Marcavage was also convicted of interfering with agency function under 36 C.F.R. § 2.32, which sets forth several ways a person may be guilty of "interference." Marcavage was found guilty of committing interference in two such ways.[3] We need

_____

[3]The two relevant provisions of 36 C.F.R. § 2.32 read as follows:

(a) The following are prohibited:

(1) Interference. Threatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an

9

not be detained long in concluding that the government presented sufficient evidence for the Magistrate Judge to have reasonably found that Marcavage "resist[ed] . . . or intentionally interfer[ed] with" the rangers in the course of their official duties, *see* 36 C.F.R. § 2.32(a)(1), one of the ways Marcavage was found to have committed "interference." That conclusion, however, does not immunize the government's case against Marcavage's First Amendment challenge, for if we conclude that Marcavage's First Amendment rights were violated because of the restrictions[4] placed on his speech, his § 2.32 conviction

> official duty, or on account of the performance of an official duty.
>
> (2) Lawful order. Violating the lawful order of a government employee or agent authorized to maintain order and control public access and movement during fire fighting operations, search and rescue operations, wildlife management operations involving animals that pose a threat to public safety, law enforcement actions, and emergency operations that involve a threat to public safety or park resources, or other activities where the control of public movement and activities is necessary to maintain order and public safety.

[4]Throughout this opinion, we interchangeably use variants of the words "restriction," "regulation," and "exclusion" to refer to the government's actions vis-à-vis

perforce fails. *See*, *e.g.*, *United States v. Stevens*, 533 F.3d 218 (3d Cir. 2008) (en banc) (vacating criminal conviction on First Amendment grounds), *aff'd on other grounds*, 559 U. S. \_\_\_, 130 S. Ct. 1577 (2010). With that in mind, we now turn our attention to Marcavage's First Amendment challenge.

**B.     The Nature of Marcavage's First Amendment Challenge**

At the outset of our analysis we must frame the precise issue before us, as Marcavage does not clearly specify whether he is mounting a facial or an as-applied constitutional attack, and the Magistrate Judge and the District Court did not explicitly clarify the lens through which they viewed that attack. A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988). An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under

---

Marcavage's speech. The government disputes the characterization that Marcavage was excluded from the 6th Street sidewalk, but the record leaves no doubt that the rangers repeatedly ordered him to move his demonstration to either Market Street or what the rangers described as a "free speech area" on the other side of the Liberty Bell Center. When Marcavage refused, he was forcibly removed from the sidewalk. This dispute, in any event, boils down to a semantic cavil that does not affect the disposition of this case.

11

particular circumstances deprived that person of a constitutional right. *See*, *e.g.*, *Wis. Right to Life, Inc. v. FEC*, 546 U.S. 410, 411-12 (2006) (per curiam). A criminal defendant may seek to vacate his conviction by demonstrating a law's facial or as-applied unconstitutionality. *See*, *e.g.*, *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *United States v. Eichman*, 496 U.S. 310 (1990); *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940). In response to our inquiry at oral argument, Marcavage's counsel asserted that his client's challenge was a hybrid of the two. There is certainly nothing impermissible about arguing in the alternative, *see Citizens United v. FEC*, 558 U. S. ___, 130 S. Ct. 876, 892 (2010), but insofar as Marcavage's challenge is facial his burden is significantly heavier, *see Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998), and we may dispatch it briefly.

There are two main ways to succeed on a facial challenge in the First Amendment context. A plaintiff may demonstrate either "'that no set of circumstances exists under which the [law] would be valid,' *i.e.*, that the law is unconstitutional in all of its applications," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)), or that the law is "overbroad because a substantial number of its applications are unconstitutional, judged in relation to the [law's] plainly legitimate sweep," *id.* at 449 n.6 (internal quotation marks and citation omitted).[5] Marcavage cannot meet either test, as he has

[5]Not all of the Justices agree on the first formulation of a facial attack, *see Wash. State Grange*, 552 U.S. at 449 (noting

12

not even tried to convince us that the regulation criminalizing interference with agency function is unconstitutional for all purposes and all applications or that it is overbroad. *See id.* at 449 n.6; *United States v. Bjerke*, 796 F.2d 643, 648 (3d Cir. 1986).[6]

Although his position may want for clarity, Marcavage's chief complaint, as we understand it, is that the government squelched his speech on a particular day and in a particular place because he was talking about abortion, and that the government had no warrant to do so under the circumstances. While a sprinkling of the cases on which he relies involve facial attacks, the outcome Marcavage advocates is for all intents and purposes entirely dependent on the facts of this case, and he nowhere even obliquely suggests that the constitutionality of the regulation at issue should be assessed against a broader backdrop. That is a classic as-applied challenge. *See Wash. State Grange*, 552 U.S. at 444; *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 802-03 (1984).

that "some Members of the Court have criticized the *Salerno* formulation"), but it retains vitality in this circuit, *see*, *e.g.*, *Khouzam v. Attorney Gen. of the United States*, 549 F.3d 235, 258 (3d Cir. 2008).

[6]Insofar as Marcavage may have attacked the Park's permitting scheme on either facial or as-applied grounds, that challenge is no longer before us, as we have already concluded that Marcavage's conviction for violating the terms of a permit must be vacated on other grounds.

13

Accordingly, we may train our sights on the question whether the government's regulation of Marcavage's speech was constitutional in this particular case.[7]

## C.	Forum Analysis

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people to peacefully assemble." U.S. Const. amend I. The degree of First Amendment protection a speaker enjoys depends on the type of forum in which his expressive activity occurred. *McTernan v. City of York*, 564 F.3d 636, 652 (3d Cir. 2009). The Supreme Court has identified three different types of fora: "the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) (quotation marks and citation omitted). "Traditional public fora are defined by the objective characteristics of the property, such as whether, by long tradition or by government fiat, the property has been devoted to assembly and debate." *Id.* (internal quotation marks and citation omitted). "Designated public fora, in contrast, are created by purposeful governmental action." *Id.* The third category, nonpublic fora, includes all remaining

_____

[7]Marcavage's effort to vacate his conviction on First Amendment grounds is supported by the American Civil Liberties Union of Pennsylvania as *amicus curiae*. *Amicus* has taken no position on whether there is sufficient evidence to sustain Marcavage's conviction.

14

government property. *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678-79 (1992).

The Magistrate Judge determined that the 6th Street sidewalk is a nonpublic forum largely because the Park superintendent designated it as a "restricted" area and opened it up to the public for the sole purpose of providing access to the Liberty Bell Center. The District Court agreed with that determination for largely the same reasons, though the District Court added that the sidewalk's physical characteristics – in particular, its chain-linked bollards and Belgian block – as well as the presence of human congestion, made it a nonpublic forum. Neither of the parties here describes the 6th Street sidewalk as a designated public forum, so we will limit our analysis to the other two categories.[8] Hoping for the greatest amount of protection, Marcavage argues that the sidewalk is a

---

[8]To the extent Marcavage and *amicus* suggest that the 6th Street sidewalk was somehow converted into a designated public forum merely by its heavy pedestrian traffic, we are unpersuaded, as there must be an affirmative governmental intent to create such a forum, and there is no evidence here of any such intent. *See United States v. Kokinda*, 497 U.S. 720, 730 (1990) (plurality opinion); *Bjerke*, 796 F.2d at 649-50; *see also Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.*, 691 F.2d 155, 159 (3d Cir. 1982) ("[A] place owned or controlled by the government does not become a public forum simply because members of the public are freely permitted to visit it.").

15

public forum. The government, in turn seeking to lower its burden, asks us to find that the sidewalk is a nonpublic forum.

It is well established that traditional public fora include sidewalks, streets, and parks that the public has historically used for assembly and general communication. *See Hill v. Colorado*, 530 U.S. 703, 715 (2000); *Frisby v. Schultz*, 487 U.S. 474, 480-81 (1988); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). This Court, in fact, has specifically remarked that "the streets and sidewalks of Philadelphia[] [are] an undisputed quintessential public forum." *Startzell v. City of Phila.*, 533 F.3d 183, 196 (3d Cir. 2008). Notwithstanding a sidewalk's presumptive status as a public forum, "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981). In other words, not all public sidewalks constitute public fora for First Amendment purposes. *McTernan v. City of York*, 577 F.3d 521, 527 (3d Cir. 2009). The question whether a particular sidewalk is a public or a nonpublic forum is highly fact-specific and no one factor is dispositive. *See, e.g., Kokinda*, 497 U.S. at 727-29 (plurality opinion); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 805 (1985); *United States v. Grace*, 461 U.S. 171, 177-78 (1983). A court must consider the forum's physical traits as well as its past uses and purposes. *See, e.g., Kokinda*, 497 U.S. at 727-29 (plurality opinion); *Grace*, 461 U.S. at 179-80; *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939).

In determining whether a sidewalk is a public or nonpublic forum, its physical appearance is one factor to be

16

considered. In *United States v. Grace*, 461 U.S. 171, the Supreme Court held that a public sidewalk directly next to the Supreme Court building was a public forum even though it was included in a statutory definition of Court property. Noting that the sidewalk was not visually distinguishable from others to which it was connected or in close proximity, the Supreme Court explained that "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id*. at 180. Since *Grace*, the Supreme Court has taught that "separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction." *Lee*, 505 U.S. at 680 (citing *Grace*, 461 U.S. at 179-80).

Here, the 6th Street sidewalk is largely indistinguishable to the naked eye from the sidewalks nearby. It is true that, unlike the sidewalk on the other side of 6th Street and those on the other sides of Market and Chestnut Streets, respectively, the 6th Street sidewalk is made, at least in part, of Belgian block. But, as noted, so are the Chestnut and Market Street sidewalks lining the Park. And we are aware of no authority suggesting that a unique construction material underfoot, without more, would necessarily put an individual on notice that he was suddenly treading on a different sort of government property where expressive activity was disallowed. In fact, courts have concluded quite to the contrary. *See*, *e.g.*, *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1103 (9th Cir. 2003) (sidewalk was public despite decorative pavement); *Venetian Casino Resort v. Local Joint Executive Bd. of Las Vegas*, 257 F.3d 937,

17

945 (9th Cir. 2001) (different paving and landscaping did not transform a public sidewalk); *Gerritsen v. City of Los Angeles*, 994 F.2d 570, 576 (9th Cir. 1993) (blue lines on a sidewalk insufficient to distinguish it from a public park). The 6th Street sidewalk is also bordered by chain-linked metal bollards, but here again, so are the Chestnut and Market Street sidewalks to which the 6th Street sidewalk is physically joined. *See Venetian Casino Resort*, 257 F.3d at 945 (noting absence of "barriers or other physical boundaries to indicate to . . . pedestrians . . . that the sidewalk . . . enjoys a different legal status than the public sidewalks to which it is seamlessly connected").

Together, the Belgian block and bollards arguably lend some support, however minor, to the government's position that the 6th Street sidewalk is a nonpublic forum. In the end, though, we think these distinctions immaterial, as there is little else distinguishing the 6th Street sidewalk from any of the sidewalks to which it is actually connected. *See Lee*, 505 U.S. at 680; *Venetian Casino Resort*, 257 F.3d at 947-48 (holding that a privately-owned sidewalk that was "connected to and virtually indistinguishable from the public sidewalks to its north and south" was "the archetype of a traditional public forum" (quotation marks and citation omitted)); *Freedom From Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 494-95 (7th Cir. 2000) (property was public where it was "not physically differentiated from the surrounding public park, and no visual boundaries . . . would inform the reasonable but unknowledgeable observer that the . . . property should be distinguished from the public park"); *Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992) (sidewalks near Vietnam Veterans Memorial wall were public due, in part, to their

18

"apparent similarity to ones of the classic variety"). And at any rate, even assuming these physical characteristics sufficed to put an individual on notice that he was entering "some special type of enclave," *Grace*, 461 U.S. at 180 – a highly dubious proposition under the circumstances – "[t]he mere physical characteristics of the property cannot dictate forum analysis," *Kokinda*, 497 U.S. at 727 (plurality opinion).

Even if the 6th Street sidewalk's physical appearance does not weigh decisively in one direction or the other, its historical uses practically cement its public forum status. Traditional public fora are "places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry*, 460 U.S. at 45. As noted, sidewalks presumptively fit that description, *Hill*, 530 U.S. at 715, and the 6th Street sidewalk is no exception. The record does not reflect that it has ever been a place free of "public assembly and debate." *See Frisby v. Schultz*, 487 U.S. 474, 480 (1988). On the very day of Marcavage's demonstration, in fact, there was a breast cancer awareness march proceeding along the Park's edge, including on the 6th Street sidewalk. Members of the public are permitted to freely travel along the sidewalk in either direction, take a break and stand for a moment, or use it to go to any destination they please, and all this without obtaining a permit or otherwise seeking permission. Like the sidewalks abutting 5th, Market and Chestnut Streets, it is open to walkers, joggers, cyclists, and skateboarders; there are no time restrictions on when people may use any of those sidewalks; and there are no signs anywhere indicating that those sidewalks are closed off to expressive activity. *See Lederman v. United States*, 291 F.3d 36, 43 (D.C. Cir. 2002) (sidewalk next to the Capitol Grounds in Washington,

19

D.C., was a public forum where it was frequented by "tourists, joggers, dogs, and strollers"); *Henderson*, 964 F.2d at 1182 (sidewalks near memorial were public where they were "used for the full gamut of urban walking" and were "used by thousands of pedestrians every year, including not only Memorial visitors but also people going to other places"). The 6th Street sidewalk's widespread use as a common thoroughfare strongly supports a finding that it is a public forum. *See City of Las Vegas*, 333 F.3d at 1101 ("[W]hen a property is used for open public access or as a public thoroughfare, we need not expressly consider the compatibility of expressive activity because these uses are inherently compatible with such activity." (citation omitted)); *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1128 (10th Cir. 2002) (similar); *Warren v. Fairfax County*, 196 F.3d 186, 189-90 (4th Cir. 1999) (en banc) (similar); *cf. Del Gallo v. Parent*, 557 F.3d 58, 72 (1st Cir. 2009); *Bjerke*, 796 F.2d at 649.

For similar reasons, the 6th Street sidewalk's purposes likewise connote its status as a traditional public forum. True, the sidewalk permits the sole way into and out of the Liberty Bell Center, or at least it did on the day of Marcavage's demonstration. But, as noted, it is also a largely unrestricted, common thoroughfare, accessible to pedestrians walking in either direction to destinations other than the Liberty Bell. These circumstances sharply distinguish the 6th Street sidewalk from sidewalks and streets that are separate from the common thoroughfare and are designed exclusively to permit access to a particular building or area. *See, e.g.*, *Kokinda*, 497 U.S. at 727-28 (plurality opinion) ("[T]he postal sidewalk was constructed solely to provide for the passage of individuals

20

engaged in postal business . . . [and] not to facilitate the daily commerce and life of the neighborhood or city."); *Greer v. Spock*, 424 U.S. 828, 837-38 (1976) (sidewalks on a military base were nonpublic); *McTernan*, 577 F.3d at 527-28 (ramp parallel to a public sidewalk leading to a Planned Parenthood facility was nonpublic because its only purpose was to allow access to the facility); *Bjerke*, 796 F.2d at 649 (walkway was nonpublic where it served only to provide post office access). Unlike the sidewalks discussed in such cases, the 6th Street sidewalk is more fairly described as "a necessary conduit in the daily affairs of the locality's citizens," or "a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981).

Finally, we note that there is no evidence in the record that the 6th Street sidewalk or its environment bears any special characteristics suggesting anything other than a public forum. *Cf. Greer*, 424 U.S. at 838 (military installation was not a public forum because its business was to train solders, not to serve as a place for expressive activity); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (noting "the special characteristics of the school environment"). In light of all these circumstances, we hold that the 6th Street sidewalk, "[a]s a 'thoroughfare sidewalk,' seamlessly connected to public sidewalks at either end and intended for general public use,"

21

*Venetian Casino Resort*, 257 F.3d at 948 (quoting *Frisby*, 487 U.S. at 480), is a traditional public forum.[9]

---

[9]We are unswayed by the government's several arguments to the contrary. To be sure, the government has proffered evidence that the Park published an advertisement after September 11, 2001, announcing new security measures, including the requirement that visitors to the Liberty Bell Center show identification upon entry. The government also spotlights the Park's regulation omitting the 6th Street sidewalk from a list of approved locations for demonstrations. But to the extent the government contends that the 6th Street sidewalk is a nonpublic forum simply because the Park had jurisdiction over it and the authority and discretion to issue permits, the government misses the mark, as "[t]he issuance of a permit to use [a] public forum does not transform its status as a public forum." *Startzell*, 533 F.3d at 196 (citations omitted).

We are no more convinced by the government's position that the National Park Service effectively converted the 6th Street sidewalk into a nonpublic forum for a limited time due to ongoing construction that restricted ingress into and egress out of the Liberty Bell Center, as the government "may not by its own *ipse dixit* destroy the public forum status of streets and parks which have historically been public forums." *Grace*, 461 U.S. at 180 (internal quotation marks, alteration and citation omitted); *see Forbes*, 523 U.S. at 678 ("[T]raditional public fora are open for expressive activity *regardless of the government's intent*." (emphasis added)). To change a property's public forum status, the government "must alter the objective physical

22

character or uses of the property . . . ."  *Lee*, 505 U.S. at 700 (Kennedy, J., concurring in the judgment).  We have been shown no indication that the government did so here.  For that very reason, the government's own evidence that the south side of Chestnut Street, between 5th and 6th Streets, has been entirely closed off to the public, actually undermines, rather than bolsters, its position, as the 6th Street sidewalk inarguably has not been closed off.

The government's apparent argument that the 6th Street sidewalk is a nonpublic forum because it is part of the Park is likewise unpersuasive, as the government has not even attempted to establish that the Park itself is not a public forum. *Cf. Pleasant Grove City v. Summum*, 555 U. S. ___, 129 S. Ct. 1125, 1129 (2009) ("[A] park is a traditional public forum for speeches and other transitory expressive acts."); *Student Coalition for Peace v. Lower Merion Sch. Dist. Bd. of Sch. Dirs.*, 776 F.2d 431, 435 (3d Cir. 1985) (parks are "paradigmatic examples" of public fora).  Indeed, the National Park Service's own description of the Park would critically enfeeble any such argument. *See* National Park Service, Independence National Historical Park, History & Culture, http://www.nps.gov/inde/historyculture/index.htm (last visited June 14, 2010).  Similarly, the government's own evidence would undercut that argument.  The preface to the regulations governing demonstrations in the Park states that "[t]he Bill of Rights was adopted in 1791 in what is now Independence National Historical Park; therefore, the [P]ark has *a singular association with the rights of assembly and free speech*." (Supp.

23

### D.    Speech Restrictions in a Traditional Public Forum

Because the Magistrate Judge and the District Court wrongly concluded that the 6th Street sidewalk was a nonpublic forum, their principal analyses subjected the government's restrictions on Marcavage's speech to an improperly low constitutional bar.  The constitutionality of those restrictions instead must be measured against a more exacting set of benchmarks.[10]

---

App. 23 (emphasis added).)

Finally, the government's reliance on *United States v. Goldin*, 311 F.3d 191 (3d Cir. 2002), is misplaced.  There, the parties did not dispute that the interior of the Liberty Bell Center was a limited public forum, so we took them at their word and did not independently analyze its status.  We strongly doubt, in any event, that the interior of the Liberty Bell Center would qualify as a traditional public forum in the way a sidewalk does.

[10]The Magistrate Judge alternatively found the government's restrictions on Marcavage's speech constitutional under an intermediate standard of scrutiny even if the 6th Street sidewalk were classified as a public forum, a finding with which the District Court agreed.  Significantly, that finding was based in part on the conclusion that those restrictions were content-neutral.  As we will explain, we part company with the District Court on that conclusion and thus disagree with this alternative

24

In a traditional public forum, "the rights of the state to limit expressive activity are sharply circumscribed." *Perry*, 460 U.S. at 45. To determine whether speech restrictions in such a forum are constitutional, we apply the time, place, and manner doctrine. *Brown v. City of Pittsburgh*, 586 F.3d 263, 271 (3d Cir. 2009). Under that doctrine, "the government may regulate the time, place, and manner of . . . expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication." *Burson v. Freeman*, 504 U.S. 191, 197 (1992) (plurality opinion) (citations omitted). However, if speech restrictions in a public forum are content-based, we test their constitutionality by asking whether they were necessary to serve a compelling government interest, were narrowly drawn to achieve that interest, and were the least restrictive means of achieving that interest. *See Perry*, 460 U.S. at 45. The burden is on the government to justify a restriction on speech. *See Startzell*, 533 F.3d at 201; *N.J. Citizen Action v. Edison Twp.*, 797 F.2d 1250, 1255 (3d Cir. 1986).

The first element of the test asks whether the restrictions on Marcavage's speech were content-neutral or content-based. "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (internal quotation marks and citation omitted). Content-neutral restrictions are those "that are justified without reference to the content of the

---

holding.

25

regulated speech." *City of Renton v. Playtime Theatres*, 475 U.S. 41, 48 (1986) (internal quotation marks, emphasis and citations omitted). Content-based restrictions, in contrast, encompass restrictions not only on "particular viewpoints" but also "an entire topic." *Consol. Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 537 (1980). "To determine if a restriction is content neutral, 'the principal inquiry in speech cases . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Startzell*, 533 F.3d at 197 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (other alterations omitted). "It is the government's purpose that controls." *Id.* (citation omitted). To find that that purpose is content-based, "[s]omething must point decisively to a motivation based on the subject matter, or content, of the speaker's message . . . ." *McTernan*, 564 F.3d at 653. "Deciding whether a particular regulation is content-based or content-neutral is not always a simple task." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994).

As he did before both the Magistrate Judge and the District Court, Marcavage asks us to infer that his speech was suppressed because of its content based primarily on: (1) the presence of a large number of carriage drivers as well as other pedestrians, including breast cancer awareness marchers who were proceeding along the 6th Street sidewalk at the same time as his demonstration but were not told to move to a different location; and (2) the Park rangers' testimony that they both observed and were concerned that those pedestrians as well as Liberty Bell visitors were disturbed by Marcavage's anti-

26

abortion message.[11]  The Magistrate Judge acknowledged the testimony bearing on these points but found that the marchers, like other pedestrians using the sidewalk, were in constant motion and therefore were not obstructing traffic flow while, he noted, Marcavage and his group were stationary.  Without explicitly addressing the rangers' testimony about their perception of the reaction to Marcavage's message, the Magistrate Judge found "no credible evidence that [Marcavage] was asked to move his protest due to the content of his message." (J.A. I 30.)  The District Court, seeing no clear error in the Magistrate Judge's findings, likewise rejected Marcavage's claim in this vein.

---

[11]Marcavage also intimates that his speech was regulated not only because of its content but because of his viewpoint. We acknowledge that homing in on the difference between viewpoint discrimination and content discrimination is sometimes difficult. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 830-31 (1995).  In this case, however, the distinction is crystal-clear.  The government engages in viewpoint-based discrimination when it "attempts to differentiate between divergent views on a singular subject" or "pick[s] and choose[s] among similarly situated speakers in order to advance or suppress a particular ideology or outlook." *McCullen v. Coakley*, 571 F.3d 167, 175 (1st Cir. 2009) (quotation marks and citation omitted).  There is no claim here, nor is there any hint in the record, that the rangers exhibited a preference for a *different* abortion message than the one Marcavage espouses.  Rather, if anything, the rangers tried to stamp out *any* abortion-related communication.

Although the Magistrate Judge did not say so explicitly, in finding that Marcavage's removal was content-neutral he evidently credited the rangers' testimony that their motivation for removing Marcavage was based exclusively on their concern for public safety and their observation that Marcavage's activities were creating a choke point.[12] The Magistrate Judge made that finding without explaining how it squared with the rangers' other testimony highlighting their concerns about the reaction of other individuals to Marcavage's speech or with photographic and video evidence painting a decidedly different picture from the one the rangers described. By the same token, although not stated in as many words in his opinion, the Magistrate Judge apparently discounted Marcavage's testimony that his removal was a result of the reaction of other individuals as well as his argument that the rangers regulated the speech of no one else on the 6th Street sidewalk. In other words, although the Magistrate Judge did not directly resolve any conflicts in the trial testimony and evidence and did not make any express credibility determinations, we think it plain enough that his content-neutrality finding derived from his conclusion that the

---

[12]It bears mentioning that the Magistrate Judge did not specifically find that Marcavage actually created a choke point, but rather that Marcavage "*was told* that his protest activities was [sic] creating a choke point on the sidewalk that interfered with the flow of visitors into the Liberty Bell Center." (J.A. I 30 (emphasis added).) That finding perhaps could have been expressed more articulately, but under the circumstances we believe it to be tantamount to a finding that there was in fact a choke point.

rangers were credible and that Marcavage was not, at least on this central point of contention.

We ordinarily defer to a trial court's factual findings, particularly when they are predicated on credibility determinations. *See United States v. Givan*, 320 F.3d 452, 464 (3d Cir. 2003); *see also*, *e.g.*, *United States v. Johnson*, 302 F.3d 139, 149-50 (3d Cir. 2002). We adhere to that default rule, however, only where the trial court's "decision is based on testimony that is coherent and plausible, not internally inconsistent and not contradicted by external evidence[.]" *United States v. Igbonwa*, 120 F.3d 437, 441 (3d Cir. 1997). As the Supreme Court has explained, a

> trial judge may [not] insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.

*Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (citation omitted).

In our view, the factors the *Anderson* Court described are attendant here. There are simply too many inconsistencies and gaps in the testimony of the government's witnesses, not to mention substantial contradictions between that testimony and other evidence in the record, for us to accept the finding that Marcavage's removal was not motivated by the content of his speech. Because "deference to the trier of fact . . . is the rule, not the exception," *id.* at 575, we will lay out the reasoning behind our conclusion in some detail.

Ranger Saperstein testified that he heard complaints about Marcavage's demonstration "[f]rom visitors, from the horse carriage drivers, and from other employees." (J.A. II 58.) When Marcavage asked Saperstein what the problem was with demonstrating on the sidewalk, Saperstein told Marcavage that the reason he had to move was that he was not giving others the option of not seeing his signs. Saperstein also testified that the complaints he received were tied directly to the "the signs and the messages depicted" and that "[p]eople were upset that they were there . . . ." (J.A. II 67.) Saperstein acknowledged that he told Marcavage that he could not stand near the Liberty Bell Center's entrance or exit "because he wasn't giving . . . the visitors . . . the option of not seeing [his] signs," and because "they [had] no choice but to be hit with [his] message." (J.A. II 68.) When asked whether one of his concerns was that Marcavage was not giving people the option of not seeing his signs, Saperstein responded, "Yeah, that was one of the – one of the concerns." (J.A. II 69.)

Chief Ranger Crane also testified that he was concerned about the impact of Marcavage's message on Liberty Bell

30

visitors. Crane stated that he said the following to Marcavage over the telephone: "I said to him, you know, Michael, it's kind of unfair. You are at an advantage of speaking, you know, to a group that can't leave. Those individuals are there to see the Liberty Bell and if they want to see the Liberty Bell, they have to listen to your message." (J.A. II 170.) Later on, Crane attempted to clarify those remarks. He testified that he "did not have a concern of whether those individuals cared to hear his message or not. What I believe that I was trying to impress on Mr. Marcavage was that there were plenty of areas that he could go to and speak his message . . . where people could choose or choose not to go." (J.A. II 197.) Crane reiterated that stance at various points during his testimony.

Nan Byrne, another ranger working at the Liberty Bell Center on the day of Marcavage's demonstration, echoed Saperstein's and Crane's testimony about the concern that Liberty Bell Center visitors were constrained to listen to Marcavage's message and Saperstein's observation of those visitors' reactions to Marcavage's message. She was asked whether "some people were perhaps upset by the message that was being delivered by the people with the bullhorn[.]" (J.A. II 121.) Her answer: "Well, sure they were. Sure, I mean, you know, it was a pretty intense message, and there were people with little kids and stuff, so yes, some of them were upset with the message." (*Id.*) When asked whether that reaction was part of her concern, Byrne stated, "No, my concern was – well, it was that, but the bullhorn, too." (*Id.*)

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the

31

expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (citations omitted); *see also Bachellar v. Maryland*, 397 U.S. 564, 567 (1970). Thus, "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Boos v. Barry*, 485 U.S. 312, 322 (1988) (plurality opinion) (internal quotation marks and citations omitted). These principles are well embedded in First Amendment jurisprudence. Together they stand for the proposition that where the government regulates speech based on its perception that the speech will spark fear among or disturb its audience, such regulation is by definition based on the speech's content.[13] *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation." (citations omitted)); *Ctr. for Bio-Ethical Reform, Inc. v. L.A. County Sheriff Dep't*, 533 F.3d 780, 789 (9th Cir. 2008); *Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999). Ever vigilant against "improper attempts to value some forms of speech over others," *City of Ladue v. Gilleo*, 512 U.S. 43, 60 (1994) (O'Connor, J., concurring), the Supreme Court and the courts of appeals have consistently held unconstitutional regulations

---

[13]The First Amendment's proscription of speech regulation based on audience reaction has sometimes been referred to as the "heckler's veto." *See Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (plurality opinion); *see also Startzell*, 533 F.3d at 200.

based on the reaction of the speaker's audience to the content of expressive activity.[14]

---

[14]*See, e.g., United States v. Playboy Entm't Group*, 529 U.S. 803, 811-12 (2000) ("The overriding justification for the regulation is concern for the effect of the subject matter on [its audience]. . . . This is the essence of content-based regulation."); *Forsyth County*, 505 U.S. at 134 (striking down ordinance that computed parade fees based on estimated cost of ensuring public safety because the "fee assessed . . . depend[ed] on the administrator's measure of the amount of hostility likely to be created by the speech based on its content"); *Johnson*, 491 U.S. at 412 (finding a statute content-based because it punished speech based on the impact of flag desecration on its audience); *Boos*, 485 U.S. at 321 (plurality opinion) (explaining that "[t]he emotive impact of speech on its audience is not a 'secondary effect'" and concluding that a regulation barring critical displays in front of embassies to protect foreign diplomats was content-based); *Cox v. Louisiana*, 379 U.S. 536, 555 (1965) (holding that police could not bar a civil rights protest because of "fear of violence . . . based upon the reaction of the group of white citizens looking on from across the street"); *see also, e.g., Ovadal v. City of Madison*, 416 F.3d 531, 533-34, 537 (7th Cir. 2005) (reversing summary judgment where Christian protestors were threatened with arrest while displaying signs over a highway and disturbing drivers because "[t]he police must permit the speech and control the crowd; there is no heckler's veto" (quotation marks and citation omitted)); *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 372-74 (D.C. Cir. 1992) (holding that the District

33

Here, the rangers' testimony reflects that they: observed that Liberty Bell visitors and pedestrians were disturbed by and complained about Marcavage's preaching and the graphic images on the signs displayed by Marcavage's group; were concerned by visitors' reactions to that message and those signs; and thought it unfair that those individuals were being subjected against their will to listening to that message and viewing those signs. Significantly, they testified that their decision to remove Marcavage was a product of, among other things, those concerns.

Marcavage testified that he travels throughout Pennsylvania to "express the grievous situation we have in our nation where over four thousand babies are killed at the hands of abortionists." (J.A. II 305.) He illustrated his view of the abortion procedure: "Their beating hearts are stopped, they are torn limb from limb in their mother's womb in the name of choice." (*Id.*) His group's perception of the tangible aftermath of that procedure was emblazoned on its signs for all to see; they bore various vivid depictions of mutilated fetuses. No matter one's personal feelings about abortion, the images are jarring, their shock value unmistakable. Presumably, that was the point. But "[s]peech cannot be . . . punished or banned[] simply because it might offend" its audience. *Forsyth County*, 505 U.S. at 134-35; *see Brazos Valley Coalition for Life, Inc. v. City of Bryan*, 421 F.3d 314, 326 (5th Cir. 2005) ("[T]he government

of Columbia's "proposed restriction of the location of the Klan's march, resting as it did on the threat of listeners' violent reaction to the message being delivered, was content based").

cannot restrict speech out of a concern for the discomfort it might elicit in listeners." (citations omitted)). The government in effect ratified what it perceived as listener hostility to Marcavage's speech when it silenced that speech. That act, coupled with its impetus, constitutes a content-based restriction on speech.[15]

Our problem with the District Court's content-neutrality finding is not based just on the incongruity between the rangers' testimony about their concerns over the impact of Marcavage's message and their testimony about the other reasons for their decision to restrict Marcavage's speech. We also find their

[15]In *City of Renton v. Playtime Theatres*, 475 U.S. 41, the Supreme Court held, in the context of a facial attack on an ordinance on First Amendment grounds, that a statute was content-neutral where the government's "predominate" concerns in enacting it did not relate to the content of the speech the statute sought to regulate, even though "a motivating factor" in enacting the statute was the suppression of a particular kind of speech. *Id.* at 47-48. *Renton*'s secondary effects analysis does not inform our inquiry, as the question before us is not what the government's purpose was in enacting a regulation but rather the motivation of the rangers in this case for excluding Marcavage from the 6th Street sidewalk. *See Presbytery of N.J. of the Orthodox Presbyterian Church v. Whitman*, 99 F.3d 101, 106 (3d Cir. 1996) (concluding that "if the district court correctly abstained from deciding appellants' as applied challenge, its discussion of viewpoint discrimination and the secondary effects doctrine was unnecessary").

professedly exclusive motive of hazard avoidance irreconcilably at odds with their admissions that no hazard ever materialized. Saperstein testified that he observed many people walking along the 6th Street sidewalk and several times described the area around Marcavage, his co-demonstrators, and their signs as a choke point. (*E.g.*, J.A. II 48, 81.) Crane, although he was not present during Marcavage's demonstration, said more or less the same thing. (*E.g.*, J.A. II 180.) But importantly, neither Saperstein nor Crane testified in any detail about what Marcavage was specifically doing to block pedestrian traffic despite being afforded ample opportunity to do so. For instance, when Marcavage's counsel argued during Saperstein's cross-examination that the rangers had not "identified any public safety issue," (J.A. II 82), the Magistrate Judge instructed Saperstein to be more specific. The prosecutor then asked Saperstein to "[t]ell us safety hazards regarding the entry and exit to the Liberty Bell Center . . . at around the time that Mr. Marcavage was in the area." (J.A. II 83.) Saperstein responded:

> There was a great amount of people in that area, because the – because of the activities going on. There was a large amount of people in an area that I was trying – that I needed to keep fairly clear in case an emergency happened. There is only one way in and one way out. So, I guess if I needed to get somebody in, there are two ways to get in. But, there are very, very limited access points.

(*Id.*)

36

That testimony, of course, hardly addresses Marcavage's conduct with any particularity. Moreover, Saperstein's own testimony undercuts his assertion that Marcavage was creating a choke point. He testified, for instance, that anyone could stop and talk on the sidewalk and that Marcavage by himself did not block traffic. When asked whether "everybody was able to get passed [sic] Mr. Marcavage," Saperstein replied, "At this point, yeah, looking at it, there is [sic] people getting through." (J.A. II 86.) When asked whether Marcavage ever physically blocked anyone, Saperstein said, "Not physically, no." (*Id.*) Ranger Trevor Belasco, who took several photographs of the 6th Street sidewalk and surrounding area on the day of Marcavage's demonstration, also testified that the photographs did not show that the demonstration in any way impeded the ability of pedestrians to walk freely along the sidewalk or to enter or exit the Liberty Bell Center. (J.A. II 104, 111.) Ranger Byrne likewise testified that no one standing in line to enter the Liberty Bell Center was prevented from doing so or was otherwise blocking pedestrian traffic. (J.A. II 120-21.) And Chief Ranger Crane did not answer affirmatively when asked whether Marcavage was blocking traffic. Instead, he stated that Marcavage's group "was in a location where they had signage and were using megaphones" and that Marcavage "[i]ndividually, by himself, I do not think that he . . . was specifically hindering [orderly visitation at the Liberty Bell Center]." (J.A. II 179.) When asked, however, whether members of Marcavage's group depicted in a photograph were blocking access to the Liberty Bell Center, Crane answered decisively in the negative. (J.A. II 209.)

37

The testimony of the government's witnesses that Marcavage's activities might produce or were producing unsafe conditions also directly conflicts with video and photographic evidence that was presented at trial and is included in the record on appeal.[16]  The video evidence, in particular, tells a very different story from the one the government evoked at trial.  It shows Marcavage holding a bullhorn, though not any signs, at around 12:35 p.m. while standing alone on the Belgian block portion of the 6th Street sidewalk.  There is no one either in his immediate vicinity or trying to circumvent him.  Nor is there any indication of a potential or an actual logjam among the pedestrians using the 6th Street sidewalk.  In fact, the video shows an entirely fluid procession of individuals walking in both directions and entering the Liberty Bell Center unfettered and without fanfare.  The video also shows that additional members of Marcavage's group were positioned further down the

---

[16]We have been very careful not to place excessive emphasis on the video and photographic evidence in the record, cognizant as we are of its limitations.  The video, for example, was shot by a member of Marcavage's group and is therefore refracted through that individual's point of view.  Furthermore, the video footage is not uninterrupted and the quality of its sound is variable.  Similarly, because the photographs were taken by a ranger, they are susceptible to an equal degree of one-sidedness.  All that said, both parties have relied in no small measure on both the video and photographs.  Because the video and photographs are part of the record, we have seen fit to do the same, but have not drawn any conclusions solely on the basis of that evidence.

38

sidewalk – still on the Belgian block – and away from the Liberty Bell Center entrance. Marcavage is nowhere to be seen. But even if he were present at that location, there is again no indication that these demonstrators were impeding, or even represented a threat to, pedestrian traffic. Perhaps most strikingly, the video reflects that several clutches of people unaffiliated with Marcavage's demonstration were congregated in even greater concentrations than Marcavage's group. At one point, for instance, there appear to be approximately twelve individuals arranged in a cluster; they reach almost to what seems to be the middle of the 6th Street sidewalk. Further down still and even closer to the Liberty Bell Center's entrance is a tour group consisting of around fifteen people, huddling together while listening to their tour leader. And throughout the day there was a breast cancer awareness march involving large numbers of individuals walking in throngs along the sidewalk, much of the time even closer to the Liberty Bell Center's entrance and exit than Marcavage or his co-demonstrators.

We could go on but the point, we think, is made. After exhaustively reviewing the entire record and exercising our independent judgment, we cannot accept the District Court's finding that the government restricted Marcavage's speech for content-neutral reasons, as that finding is untethered to, or wholly at variance with, the record as a whole. *Cf. Anderson*, 470 U.S. at 573-74 (appellate court may not upset factual finding "[i]f the [trial] court's account of the evidence is plausible *in light of the record viewed in its entirety*" (emphasis supplied)). We have not overlooked the *Anderson* Court's admonition that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly

39

erroneous," *id.* at 574 (citations omitted), and that "[t]his is so even when the [trial] court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts," *id.* But there are not two permissible views of the evidence here. Aside from a passing mention in an unrelated context, neither the Magistrate Judge's nor the District Court's opinion reflects any consideration of either the tension between the rangers' bald assertions that Marcavage was creating a choke point and their total inability to describe in any detail the existence or imminent conception of such, or the video and photographic evidence contradicting the rangers' accounts. *Cf. McGuire v. Reilly*, 260 F.3d 36, 45 (1st Cir. 2001) ("A [trial] court's findings of fact must be anchored in probative evidence." (citations omitted)); *United States v. Ortiz*, 966 F.2d 707, 717 (1st Cir. 1992) (factual findings "must be based on more than the trial judge's hunch, no matter how sound his instincts or how sagacious his judgment"). In our view, in light of (1) the rangers' testimony that they were concerned about the effects of Marcavage's speech on other individuals on the 6th Street sidewalk; (2) the absence of any probative evidence that Marcavage was in fact creating or risked creating a traffic flow problem; and (3) the lack of any indication that the rangers restricted the speech of even a single other individual on the 6th Street sidewalk, there is only one permissible view of the weight of the evidence: the rangers' actions were motivated by the content of Marcavage's speech. *Cf. Brown*, 586 F.3d at 295-96 & n.39; *McTernan*, 564 F.3d at 652-53; *Startzell*, 533 F.3d at 198-201.

**E.     Strict Scrutiny**

40

Because the restrictions imposed on Marcavage were content-based, they are presumptively invalid, *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991), and the government must meet the strict scrutiny standard to prove their constitutionality, *see Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). To that end, the government's restrictions on Marcavage's speech must "(1) serve a compelling governmental interest; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive means of advancing that interest." *ACLU v. Mukasey*, 534 F.3d 181, 190 (3d Cir. 2008) (citation omitted).

Evidently presuming that we would concur with the Magistrate Judge and the District Court that the restrictions on Marcavage's speech were not content-based, the government has chosen not to submit any purportedly compelling interests to us.[17] It is not our practice to make a litigant's case for it, and

---

[17]Because the Magistrate Judge and the District Court both concluded that the government regulated Marcavage's speech without regard for its content, they did not consider, even in the alternative, whether the government's actions were narrowly drawn to serve a compelling interest and whether its methods were the least restrictive means of serving those interests. Instead, they analyzed, using the intermediate scrutiny standard, whether the interests the government identified were significant. We customarily decline to consider issues not addressed by the district court. *See, e.g.*, *In re Montgomery Ward & Co.*, 428 F.3d 154, 166 (3d Cir. 2005). Our observance

the government is no exception.  *Cf. United States v. Calderon-Pacheco*, 564 F.3d 55, 58 (1st Cir. 2009) ("Courts ought not to be obliged to do a litigant's homework for him."). Nevertheless, we perceive two conceivable interests at stake here:  ensuring traffic flow and/or public safety, and regulating noise.  And, in fact, the government more or less asserted those interests in the context of its preferred intermediate scrutiny analysis.[18]

of that custom, however, is not inflexible.  We may depart from it "where the proper resolution is beyond any doubt . . . or where injustice might otherwise result."  *Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (internal quotation marks and citation omitted). We believe that either of these exceptions is triggered here.  As to the first exception, Marcavage has placed his argument that his speech was restricted based on content squarely before both the District Court and us.  The government therefore has consistently been on notice of that argument and has had ample opportunity to respond to and rebut it.  And, just as importantly, we have an adequate record to make a considered determination on that very point.  As to the second exception, Marcavage was convicted in June 2008, or approximately two years ago.  The weight of that conviction no doubt has taken its toll on him during the pendency of this appeal.  The passage of time and the importance of correcting a criminal conviction that may have been obtained in error also counsel our resolution of this case one way or the other.

[18]In fact, the government's discussion of Marcavage's bullhorn use appears mostly in the context of its rebuttal to

Traffic flow is undoubtedly a legitimate government interest, *see Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997); *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 768 (1994), and so is noise control, *see Ward*, 491 U.S. at

---

Marcavage's sufficiency-of-the-evidence claim as well as its argument that the 6th Street sidewalk is a nonpublic forum. The government mentions the bullhorn only fleetingly, and then only when comparing this case to cases the government deems analogous. Although the government arguably waived any reliance on its interest in regulating noise amplification given these circumstances, *see, e.g.*, *Kach v. Hose*, 589 F.3d 626, 642 (3d Cir. 2009), we find its reliance on Marcavage's bullhorn use unavailing for other reasons addressed elsewhere.

The government also does not argue that the violations relating to the bullhorn – interfering with ranger instructions to people in the line and violating the orders to stop using the bullhorn – were separate and distinct from the violations relating to Marcavage's refusal to vacate the sidewalk. If the rangers' only problem with Marcavage related to the amplification of his speech rather than the content thereof, an order not to use a bullhorn could be a valid time, place, and manner restriction. The record in this case is too equivocal for us to determine whether the orders to cease using a bullhorn constituted a separate content-neutral regulation or were influenced by the content-based orders to vacate the sidewalk. Because the government bears the burden of showing that the regulation is content-neutral, *Hill*, 530 U.S. at 770, we cannot affirm the bullhorn-related violations on this ground.

43

803; *Startzell*, 533 F.3d at 199 n.10. But to say that these interests are "legitimate," "valid," or "strong" is not to say that they are necessarily "compelling." Indeed, the contours of "compelling" in this context are not easily delineated. The Supreme Court itself has used variable formulations to define that term. *See, e.g., Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993) ("interests of the highest order" (quotation marks and citation omitted)); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("overriding state interest"); *see also Goldman v. Weinberger*, 475 U.S. 503, 530 (1986) (O'Connor, J., dissenting) ("unusually important interest"). And in those cases in which traffic and noise control have been identified as legitimate government interests, the Supreme Court was applying intermediate, not strict, scrutiny, so it concluded that those interests were merely "significant" or "substantial" as opposed to "compelling." *See Schenck*, 519 U.S. at 369, 375-76; *Madsen*, 512 U.S. at 771-73; *Ward*, 491 U.S. at 803.

We do not necessarily reject the general proposition that traffic and noise control may be considered compelling interests under certain circumstances, *see, e.g., Lutz v. City of York*, 899 F.2d 255, 269 (3d Cir. 1990) (assuming without deciding that "ensuring public safety and reducing . . . noise . . . can probably be deemed compelling"), and we will assume, for the sake of argument, that those interests are compelling here, *but see Snell v. City of York*, 564 F.3d 659, 668-69 (3d Cir. 2009) (finding only a significant, not a compelling, interest "in promoting traffic safety and traffic flow"). Still, the government's mantra-like incantation of these interests does not on its own establish that its restriction of Marcavage's speech was narrowly drawn

44

to serve those interests or that its actions were the least restrictive means of serving those interests.[19]  Instead, facts

[19]Although the Magistrate Judge and the District Court both mentioned Marcavage's use of a bullhorn, neither expressly concluded that the government had a significant, much less a compelling, interest in controlling noise amplification.  The Magistrate Judge also did not explicitly find that the government proved that Marcavage's bullhorn use, as opposed to someone else's, created a disturbance.  When Marcavage pointed out that alleged shortcoming in his challenge to the Magistrate Judge's ruling, the District Court was unconvinced, highlighting testimony and photographic evidence that Marcavage was using a bullhorn at some point during the demonstration, though the Court did not tie that use to the actual disturbance about which the rangers testified.

To the extent the government spotlights its interest in regulating noise amplification generally, and Marcavage's use of a bullhorn specifically, to justify its actions, we are unmoved. There is certainly record evidence that Marcavage was using a bullhorn at different times during his demonstration.  The video, for instance, depicts Marcavage speaking through a bullhorn at around 12:35 p.m.  But Ranger Saperstein testified only that he approached Marcavage at 12:10 p.m. because his "*group* was using a bullhorn[.]" (J.A. II 41 (emphasis added).)  And Ranger Byrne testified that, at some point between 11:00 a.m. and 12:00 p.m., she asked for ranger assistance while on duty outside the Liberty Bell Center because an individual whom she could not identify was using a bullhorn and thereby interfering with her

45

matter, and what may be narrowly drawn and the least restrictive means in one case will not necessarily be so in another. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 228 (1995); *McTernan*, 564 F.3d at 650-51. The government's exclusion of Marcavage from the 6th Street sidewalk cannot withstand strict scrutiny because, for interrelated reasons, that exclusion was neither narrowly tailored to serve the government's interests nor the least restrictive means of doing so. The government's assertion of compelling

---

instructions to visitors. (J.A. II 115-19.) Finally, Chief Ranger Crane testified that the use of a bullhorn interferes with rangers' directions as a general matter but did not testify that Marcavage's use in particular was creating a disturbance. (J.A. II 183.) Importantly, this testimony establishes only the flimsiest link between Marcavage's use of a bullhorn and any actual interference with or disruption to the rangers' management of the Park. Furthermore, in the chronology of events during the relevant time frame, the government's evidence shows only that Marcavage was using a bullhorn well before 1:00 p.m. at the latest. He was not arrested, however, until after 2:00 p.m. We are at a loss to understand how the government could have had an interest "of the highest order" or an "overriding" interest in halting Marcavage's use of a bullhorn when it arrested him more than one hour after he had stopped using it. On this record, therefore, we cannot conclude that the government had a compelling interest in terminating Marcavage's expressive activity based on its decibel level.

interests is just that: a bare recital unmoored from the specific circumstances of this case. *Cf. Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1267 (11th Cir. 2005) (rejecting government's "proffered interests in aesthetics or traffic safety" where the ordinance "recites those interests only at the highest order of abstraction, without ever explaining how they are served by the sign code's regulations generally").

To pass the narrow-tailoring part of the test, the government must demonstrate that its regulation of Marcavage's speech did "not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Ben Rich Trading, Inc. v. City of Vineland*, 126 F.3d 155, 163 (3d Cir. 1997) (quoting *Ward*, 491 U.S. at 799). The government has fallen short of that mark. The government does not tell us with any convincing degree of specificity, and the trial testimony does not reflect, how the regulation of Marcavage's speech served its asserted interests. The rangers testified that Marcavage endangered public safety because he was standing directly outside the Liberty Bell Center's entrance and exit. Even accepting that testimony at face value – which, for the reasons we have already discussed, we cannot do – the government has made no showing that the rangers' order that Marcavage decamp to Market Street or the other side of the Liberty Bell Center was narrowly drawn to serve its interest in ensuring public safety when: a mass of visitors was queued up along the wall outside the Liberty Bell Center, even closer to the entrance than Marcavage or any of his co-demonstrators; a procession of breast cancer awareness marchers, whose numbers far exceeded those in Marcavage's group, was moving slowly along the sidewalk; horse-drawn carriages were lined up all

47

along the curb, ready to cart tourists off for a joy ride; and countless other people were going about their business in sundry ways. All this goes to show the absence of any probative evidence in the record that these other individuals represented a lesser threat to traffic flow or public safety than Marcavage did. "Underinclusive enforcement of a law suggests that the government's 'supposedly vital interest' is not really compelling, and can also show that the law is not narrowly tailored." *United States v. Friday*, 525 F.3d 938, 958 (10th Cir. 2008) (quoting *Lukumi*, 508 U.S. at 546-47); *see also Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) ("[A] law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." (first alteration in original and quotation marks and citation omitted)); *Gilleo*, 512 U.S. at 52 ("Exemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the government's rationale for restricting speech in the first place." (citation omitted)).[20]

---

[20]As far as we can tell, the *sole* distinction the government has attempted to draw between Marcavage and anyone else on the 6th Street sidewalk is predicated on Marcavage's election to stand still while others were on the go. That distinction is plagued by crucial weaknesses. Most importantly, it is not borne out by the record. As we have explained, tour groups and others also put down stakes at various times and at various locations along the sidewalk, including near where Marcavage was standing. The record just does not support a finding that Marcavage was uniquely

Similarly, ordering – and then effectuating by force – Marcavage's wholesale removal from the 6th Street sidewalk fails the least-restrictive-means test because there were other ways the government could have attained its objectives that would have been "at least as effective." *Reno v. ACLU*, 521 U.S. 844, 874 (1997). The choice presented to Marcavage was rather stark: he could either desist entirely or demonstrate elsewhere. Common sense alone belies the necessity of such a black-and-white approach, but so does the record. Ranger Saperstein told Marcavage that he and his co-demonstrators could not stand *anywhere* on the 6th Street sidewalk. But if the government's concern had truly been limited to maintaining order and ensuring safe conditions around the Liberty Bell Center's entrance and exit, there is no reason why the rangers could not have given Marcavage the option of moving a short ways up or down the block. They did not do so.

Chief Ranger Crane's testimony likewise blunts the force of any claim that the government availed itself of the least restrictive means. Crane testified that Marcavage could have carried on with his demonstration, signs and all, if he had simply walked up and down the 6th Street sidewalk instead of standing still. That testimony dovetails with Saperstein's that an

———————————

stationary or that, if he was, he was hindering traffic flow. And the government has not adduced any evidence that Marcavage's presence at the precise location where he had positioned himself posed a risk to passers-by or that his chosen location, in conjunction with the specific physical features of the 6th Street sidewalk, created such a risk.

individual could amble to and fro along the sidewalk doing whatever he pleased without obtaining permission. But there is no indication here that the rangers entertained this option or shared it with Marcavage. The availability of these alternatives – and there were surely others – destroys any claim that the government's tack was the least restrictive means of ensuring public safety. *See Playboy*, 529 U.S. at 816 ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."); *44 Liquormart v. Rhode Island*, 517 U.S. 484, 530 (1996) (O'Connor, J., concurring in the judgment) ("The ready availability of . . . alternatives – at least some of which would far more effectively achieve [the state's] only professed goal . . . – demonstrates that the fit between ends and means is not narrowly tailored."); *see also*, *e.g.*, *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1255 (11th Cir. 2004) ("[I]t is clear that regulating as few as five peaceful protestors (e.g. silently sitting in on the edge of the sidewalk) is not the least restrictive means of accomplishing the County's legitimate traffic flow and peace-keeping concerns." (footnote omitted)).

Having been presented with Marcavage's First Amendment challenge, the government shouldered the burden of establishing that its regulation of his speech was constitutional. *See Playboy*, 529 U.S. at 816. The government sought to meet that burden by arguing in only generic terms that Marcavage represented a threat to public safety. But the government was too sure of its position. Taking refuge behind the District Court's factual findings and credibility determinations, the government glossed over Marcavage's belief

50

that the restrictions on his speech were content-based. In so doing, the government failed to establish that those restrictions were both narrowly drawn to serve a compelling interest and the least restrictive means of serving that interest; it was not foreclosed from hedging its bets yet it simply elected not to do so. The government failed to carry its burden of proving that its content-based regulation of Marcavage's speech survives strict scrutiny. Accordingly, we hold that the government impermissibly infringed Marcavage's First Amendment right to free speech.

## IV.

The record in this case leaves us with the firm conviction that the Park rangers on the whole treated Marcavage and his group with courtesy and respect and comported themselves with no small amount of restraint and patience. And we are not insensitive to the rangers' laudable efforts to ensure the smooth operation of a national park located in the middle of a major metropolis – assuredly no easy undertaking, especially on a busy Saturday when hordes of pedestrians are idling about, hustling by, or seeking entry to historic landmarks. But while maintenance of the public order is a legitimate objective, its pursuit does not license the government to deprive an individual of a constitutional right irrespective of the circumstances. To conclude otherwise would permit the government to cast off the First Amendment's protective cloak with no more than a scripted invocation of amorphous interests. Our First Amendment jurisprudence requires a far more nuanced approach designed to strike the right balance between competing interests. On this record, we are persuaded that the scale tips in

51

Marcavage's favor. Accordingly, and for the foregoing reasons, we will vacate his conviction.